STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. BARBARA A. HILL, DEFENDANT–APPELLANT.

Argued February 29, 1988—Decided May 4, 1989.

*Ira F. Back* argued the cause for appellant.

*Jessica S. Oppenheim* argued the cause for respondent (*W. Cary Edwards*, Attorney General of New Jersey, attorney).

PER CURIAM.

We granted certification, 108 *N.J.* 651 (1987), to review the Appellate Division's affirmance of defendant's conviction for possession of methamphetamine with intent to distribute, con-

trary to *N.J.S.A.* 24:21–19a(1), *repealed by L.* 1987, *c.* 106, § 25 (current version at *N.J.S.A.* 2C:35–15). The conviction was entered on defendant's conditional guilty plea pursuant to *Rule* 3:9–3(f), after the trial court had denied defendant's motion to suppress the State's use in evidence of certain controlled dangerous substances.

The single question presented in the petition for certification is whether a warrantless search is constitutionally permissible when a police officer, seeking evidence of ownership of an unattended automobile parked not parallel to the curb, enters the unlocked vehicle and looks into a bag left on the front seat, whereupon he discovers illegal drugs. The trial court upheld the search. The Appellate Division affirmed, 217 *N.J.Super.* 624 (1987). We reverse.

I

While on duty in a patrol car at about 7:20 p.m. on October 16, 1985, Gloucester Township Police Officer Charles Boyle received a call over the police radio directing him to investigate an anonymous report of a "suspicious" blue automobile parked in front of 109 Garfield Avenue. Arriving in the area, Officer Boyle saw that a blue Volkswagen was the only car in the vicinity. The vehicle was parked with its nose about six inches from the curb and with the rear extending one or two feet from the curb. Apprehensive that the vehicle had been stolen or that the operator had met with foul play, Boyle radioed police headquarters with his location and the Volkswagen's registration number.

Without waiting for a report on the registration number the officer returned to the vehicle, illuminated the interior with his flashlight, and observed an unzippered bag on the front passenger seat. (The bag is frequently referred to in the record and in the opinion of the court below as a "handbag." Defendant corrected the trial court's reference to the container as a "purse," telling the court that "[i]t is not a purse, it is a

cosmetic bag." The court made no specific finding on the type of bag involved, apparently perceiving no significant difference: at one point it denominated the container as "a handbag [or] a cosmetic bag, whatever it may be * * *.") Discovering that the driver's door was unlocked, Boyle entered the vehicle and retrieved the bag, which he "pulled open," as he said, to check for identification of the owner. He did not find any evidence of ownership but did uncover plastic bags containing what he suspected were narcotics. Without looking anywhere else for the vehicle's registration he returned the bag to the front passenger seat, closed the driver's side door, and returned to his patrol car.

Patrolman Boyle then radioed headquarters and requested that Gloucester Township Detective Bakely join him at Garfield Avenue. Before the detective arrived, the dispatcher informed Boyle that the vehicle was registered to defendant, Barbara Hill, 4 Hampshire Road, in the Aerial section of the Township. When Detective Bakely arrived, he too entered the vehicle and discovered a registration and insurance card above the left sun visor. In the meantime the dispatcher sent another officer, Patrolman Shuck, to defendant's residence. Ms. Hill's daughter told Patrolman Shuck that defendant had gone to Atlantic City with her boyfriend, which information was transmitted to Patrolman Boyle. Thereafter, Boyle and Detective Bakely kept the Hill vehicle under surveillance until Ms. Hill returned and started to drive away at 12:05 a.m. Boyle stopped the car and transported Ms. Hill to police headquarters, where her vehicle was searched. The narcotics originally discovered by Boyle were again found, as were additional narcotics in another bag that Ms. Hill had apparently taken with her to Atlantic City and had placed in the car on her return. Defendant was then placed under arrest.

The trial court upheld the entry into defendant's vehicle and the search of her unzipped cosmetic bag or handbag, on the theory that Patrolman Boyle had a duty under the circumstances to search the unoccupied vehicle for evidence of ownership,

and that it was "as reasonable to look into a pocketbook first as it was to look in the glove compartment first." In affirming, the Appellate Division said:

> Where, as here, the policeman conducts an investigation of a possible stolen car or possible harm to the operator, both of which are more serious than most traffic offenses, we perceive no valid reason why a limited search of the vehicle for evidence of ownership should be characterized as an unreasonable search. [217 *N.J.Super.* at 628–29 (citing *State v. Leandry,* 151 *N.J.Super.* 92, 96–97 (App.Div.), certif. den., 75 *N.J.* 532 (1977)).]

## II

Both the fourth amendment to the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution require the approval of an impartial judicial officer before most searches may be undertaken. *State v. Patino,* 83 *N.J.* 1, 7 (1980). Any warrantless search is *prima facie* invalid, and the invalidity may be overcome only if the search falls within one of the specific exceptions created by the United States Supreme Court. *Ibid.* These exceptions may be found in such Supreme Court decisions as *New Jersey v. T.L.O.,* 469 *U.S.* 325, 105 *S.Ct.* 733, 83 *L.Ed.*2d 720 (1985) (the "regulatory authority" exception); *United States v. Jacobsen,* 466 *U.S.* 109, 104 *S.Ct.* 1652, 80 *L.Ed.*2d 85 (1984) (the "third party intervention" exception); *Thompson v. Louisiana,* 469 *U.S.* 17, 105 *S.Ct.* 409, 83 *L.Ed.*2d 246 (1984) (the "emergency" exception); *Texas v. Brown,* 460 *U.S.* 730, 103 *S.Ct.* 1535, 75 *L.Ed.*2d 502 (1983) (the "plain view" exception); *South Dakota v. Opperman,* 428 *U.S.* 364, 96 *S.Ct.* 3092, 49 *L.Ed.*2d 1000 (1976) (the "inventory search" exception); *United States v. Santana,* 427 *U.S.* 38, 96 *S.Ct.* 2406, 49 *L.Ed.*2d 300 (1976) (the "hot pursuit" exception); *Cady v. Dombrowski,* 413 *U.S.* 433, 93 *S.Ct.* 2523, 37 *L.Ed.*2d 706 (1973) (the "community caretaking" exception); *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 93 *S.Ct.* 2041, 36 *L.Ed.*2d 854 (1973) (the "consent search" exception); *Chimel v. California,* 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.*2d 685 (1969) (the "search incident to arrest" exception); *Lewis v. United States,* 385 *U.S.* 206, 87 *S.Ct.* 424, 17 *L.Ed.*2d 312 (1967) (the "deceptive

guest" exception); *Carroll v. United States*, 267 *U.S.* 132, 45 *S.Ct.* 280, 69 *L.Ed.* 543 (1925) (the "automobile" exception).

In a warrantless-search case the State bears the burden of establishing that the search falls within one of the foregoing exceptions. *E.g., State v. Sims*, 75 *N.J.* 337, 352 (1978). On this appeal the State has narrowed the issue considerably by its willingness to rest the validity of the search on the "community caretaking" exception to the warrant requirement. In doing so the State acknowledges that despite Patrolman Boyle's subjective hunches, a warrant to search the vehicle could not have been obtained inasmuch as there was not probable cause to believe that there was criminal activity afoot or that the vehicle would disclose evidence of crime. Given the State's position, we are not concerned with the "automobile exception" to the warrant clause, see *Carroll v. United States, supra*, 267 *U.S.* 132, 45 *S.Ct.* 280, 69 *L.Ed.* 543, nor with the "exigent circumstances" exception, *e.g., State v. Leandry*, 151 *N.J.Super.* 92 (App.Div.1977), nor with *T.L.O.*'s "regulatory authority" exception. We need decide no more than whether the facts before us call for the application of the "community caretaking" exception, and doing so it is not necessary for us to unburden ourselves of a definitive treatise on the stated exception.

The exception was first recognized by the United States Supreme Court in *Cady v. Dombrowski, supra*, 413 *U.S.* 433, 93 *S.Ct.* 2523, 37 *L.Ed.*2d 706, and more recently in *South Dakota v. Opperman, supra*, 428 *U.S.* 364, 96 *S.Ct.* 3092, 49 *L.Ed.*2d 1000. *Cady* upheld the warrantless search of an impounded automobile belonging to an off-duty Chicago police officer. The automobile was involved in an accident in Wisconsin, and because its presence on the highway presented a hazard to other motorists, it was removed by the local police to a nearby garage, the owner being too intoxicated to make those arrangements himself. The local police, believing that Chicago Police Department regulations required officers to carry their revolvers at all times, searched the car at the garage to find the gun. Because they were not investigating any crime, they did

not obtain a warrant. During the search the police discovered bloody garments belonging to a recent homicide victim, which in turn led to a conviction for murder. The Supreme Court rejected defendant's fourth-amendment argument, holding that the search, undertaken under the "community caretaking" function, was reasonable. The Court emphasized two factual considerations:

First, the police had exercised a form of custody or control over the [defendant's automobile]. Respondent's vehicle was disabled as a result of the accident, and constituted a nuisance along the highway. Respondent, being intoxicated (and later comatose), could not make arrangements to have the vehicle towed and stored. At the direction of the police, and for elemental reasons of safety, the automobile was towed to a private garage. Second, both the [lower courts] found as a fact that the search of the trunk to retrieve the revolver was "standard procedure in [that police] department," to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands. Although the trunk was locked, the car was left outside, in a lot seven miles from the police station to which respondent had been taken, and no guard was posted over it.

[413 *U.S.* at 443, 93 *S.Ct.* at 2529, 37 *L.Ed.*2d at 715–16.]

Because the vehicle, "like [one] obviously abandoned[,] * * * represented a nuisance," 413 *U.S.* at 447, 93 *S.Ct.* at 2531, 37 *L.Ed.*2d at 718, and because "the trunk of [the] automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals," *id.* at 448, 93 *S.Ct.* at 2531, 37 *L.Ed.*2d at 718, the Supreme Court upheld the search.

The Court next dealt with the "community caretaking" exception in *South Dakota v. Opperman, supra,* 428 *U.S.* 364, 96 *S.Ct.* 3092, 49 *L.Ed.*2d 1000, which concerned the justification for "a routine inventory search of an automobile lawfully impounded by police for violations of municipal parking ordinances." *Id.* at 365, 96 *S.Ct.* at 3095, 49 *L.Ed.*2d at 1003. The vehicle was parked in violation of a local ordinance that prohibited parking in certain downtown areas between the hours of 2 a.m. and 6 a.m. A police officer, observing the unoccupied automobile illegally parked at 3 a.m. in a restricted zone, placed on the car's windshield a parking ticket containing a warning that the vehicle "may be towed from the area." At 10 a.m.

another officer repeated the procedure. Later that same day the vehicle was "inspected" and towed to the city "impound lot." *Id.* at 365–66, 96 *S.Ct.* at 3095, 49 *L.Ed.*2d at 1003. From outside the car a police officer saw certain articles of value. He then unlocked the car and searched the interior, including the unlocked glove compartment, in which he discovered a bag of marijuana. In keeping with "standard police procedures" the officer inventoried the contents of the automobile and removed all items, including the marijuana, to the police department for safekeeping. When defendant showed up to claim his belongings, he was arrested.

The Supreme Court upheld the search of defendant's vehicle "[i]n the interests of public safety and as part of * * * 'community caretaking functions' * * *." *Id.* at 368, 96 *S.Ct.* at 3096, 49 *L.Ed.*2d at 1005. It pointed out that

> [w]hen vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger.
>
> [*Id.* at 369, 96 *S.Ct.* at 3097, 49 *L.Ed.*2d at 1005 (citations omitted).]

*Cady* and *Opperman* suggest that a predicate to the "community caretaking" exception is the impoundment of the vehicle (*Opperman*) or at least the exercise by police of custody of or control over it (*Cady*). That necessary predicate is missing in the case before. Hence the State's position is even weaker here than in *State v. Slockbower*, 79 *N.J.* 1 (1979), which rejected a warrantless search sought to be justified on "community caretaking" grounds because "there was no valid impoundment in the first instance but rather an unjustifiable investigatory search in the pretended guise of an impoundment and routine inventory." *Id.* at 7. Here there was no effort at all to impound the vehicle.

Nor should there have been. The police officer was confronted with nothing more than a small car parked in an area that allowed for parking on both sides of a normally-illuminated

twenty-five-foot wide street, with the rear wheel a foot or two from the edge of the roadway (*N.J.S.A.* 39:4–135 requires that the vehicle be parked "with the curb side of the vehicle within six inches of the edge of the roadway"). Although Patrolman Boyle offered three reasons for his entering the vehicle in search of the registration—a belief that the owner had met with foul play, that the automobile had been stolen, that the traffic laws had been violated—at oral argument the State contended that the invasion of the car had as its purpose the "speed[ing] up [of] the process of finding out what happened to this owner-operator." For that purpose, however, no entry of the car was required. As we have seen, the computer check gave the officer the requisite information in a very few minutes, and the follow-up with defendant's daughter indicated that nothing more sinister was going on than an evening's outing in Atlantic City.

In short, there was no "caretaking" required. This parking violation obviously did not "jeopardize * * * the public safety and the efficient movement of vehicular traffic," *Opperman*, 428 *U.S.* at 368–69, 96 *S.Ct.* at 3096–97, 49 *L.Ed.*2d at 1005, else why did the police leave the car for almost five hours in exactly the same position in which they found it, without placing cones or flares or attempting to move it? Nor, as confirmed by Patrolman Boyle, was there any damage to the vehicle, any sign of forced entry, any indication of violence in or about the vehicle, or anything else unusual in the vehicle's appearance save for the way it was parked. For this garden-variety parking violation there was no need to ascertain the identity of the owner: the officer need simply have placed a summons on the vehicle, see *N.J.S.A.* 39:5–25, as happens every day (in the 1988 court year over three-and-a-half million traffic complaints were filed for parking violations alone). See *State v. Gonzalez*, 114 *N.J.* 592, 606 (1989). And although the officer's effort to ascertain the identity of the vehicle's owner may have been a commendable exercise of prudence, he had only to let the

system work: the information was forthcoming from the computer within a matter of minutes.

Finally, we find inapplicable *People v. Drake*, 243 *Cal.App.*2d 560, 52 *Cal.Rptr.* 589 (1966), and *State v. Leandry, supra*, 151 *N.J.Super.* 92, both relied on by the State. The first, an automobile case distinguishable on its facts (automobile parked three or four feet from curb, with one door open), does not purport to apply the "community caretaking" exception. *Leandry* is inapplicable in the "community caretaking" context because the entry there was into a private residence, and the "community caretaking" exception has not been applied outside of the "impounded automobile" context. *United States v. Pichany*, 687 *F.*2d 204, 207–08 (7th Cir.1982).

### III

We trust that the limited import of this opinion is apparent. We decide only that this case does not fit within that single exception to the warrant requirement on which the State has chosen to rely. We imply no view of the applicability of any other theory on which the entry into defendant's automobile might be justified. The entry here does not come within the "community caretaking" function, hence the contraband discovered both at the time of the initial search and at the later search at police headquarters should have been suppressed.

The judgment of the Appellate Division is reversed. The cause is remanded to the Law Division. If the prosecution cannot go forward without the suppressed evidence, an order vacating the conviction will be entered there.

O'HERN, Justice, dissenting.

In the majority's view, the problem with this case is that it does not fit exactly into the exception to the warrant requirements asserted by the State. Law no less than life does not fit exactly into categories.

We have stated that "[i]n analyzing the validity of warrant-less searches, the strands of constitutional exceptions to the Fourth Amendment must be kept untangled." *State v. Welsh,* 84 *N.J.* 346, 354 (1980). Although this is a sound principle, it is sometimes difficult during the rapidly unfolding events of a suspected crime for the officer on patrol to recognize instantly the strands of a legal theory. Unfortunately, "this branch of the law is something less than a seamless web." *Cady v. Dombrowski,* 413 *U.S.* 433, 440, 93 *S.Ct.* 2523, 37 *L.Ed.*2d 706, 714 (1973). Justice White has reminded us that there is no "litmus-paper test * * * for determining when a seizure exceeds the bounds of an investigative stop," and that "it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment. Nevertheless, we must render judgment." *Florida v. Royer,* 460 *U.S.* 491, 506–07, 103 *S.Ct.* 1319, 1329, 75 *L.Ed.*2d 229, 242 (1983).

Although there is no unarguable answer here, I think that the Constitution does not command a police officer to await a computerized rundown of the situation before taking the most routine of housekeeping steps in law enforcement.

Would the result be different here if the computer had been down? Would the police officer then have been justified to pursue his concerns about foul play? If not, how would the officer obtain a warrant? Would the officer have to contact the prosecutor to obtain approval to obtain a warrant? *See* "Policy Statement of the Attorney General of New Jersey and the County Prosecutors Association of New Jersey Regarding Prosecutorial Review of Search Warrant Applications," *New Jersey Prosecutors Manual,* at 46–1 to 46–4 (1985) ("All applications for search warrants shall be reviewed by the Attorney General or his designees, or the appropriate County Prosecutor, or his designees, prior to their submission to the Courts for authorization."). I should hope not.

Rather, as the majority intimates, *ante* at 178, the import of its opinion is limited to the circumstances of this case, which do not justify, in the majority's view, any caretaker function. I think that function was warranted here. "[R]outine police procedures not designed as pretexts to discover evidence * * * but to accomplish a legitimate purpose," are reasonable exceptions to the warrant requirement. *State v. Esteves*, 93 *N.J.* 498, 506 (1983) (citing *Cady v. Dombrowski, supra,* 413 *U.S.* at 447–48, 93 *S.Ct.* at 2531, 37 *L.Ed.*2d at 718).

Justice GARIBALDI joins in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, and STEIN—5.

*For affirmance*—Justices O'HERN and GARIBALDI—2.