268 N.J. Super. 250 (1993)
633 A.2d 551
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
EDDIE SAEZ, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LUIS SAEZ, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ORLANDO NAVARRO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 19, 1993.
Decided November 12, 1993.
*254 Before Judges LONG, D'ANNUNZIO and KEEFE.
Lorraine J. Betancourt argued the cause for appellant Eddie Saez (A. Kenneth Weiner, attorney, Ms. Betancourt on the brief).
Kim A. Fellenz argued the cause for appellant Luis Saez (Steinberg & Fellenz, attorneys, Ms. Fellenz on the brief).
Zulima V. Farber, Public Defender, attorney for respondent Orlando R. Navarro (Vincent James Sanzone, Jr., Designated Counsel, of counsel and on the brief).[1]
Patricia Quelch argued the cause for respondent State of New Jersey, (John Kaye, Monmouth County Prosecutor, attorney, Mark P. Stalford, of counsel).[2]
The opinion of the court was delivered by KEEFE, J.A.D.
Several issues are presented by this appeal. However, the issue that divides the court is the question of whether the observation by a police officer of illegal conduct through a basement party wall *255 at the invitation of a tenant informant was an unconstitutional warrantless search. The majority concludes that it was not.
Defendants Eddie Saez, Luis Saez and Orlando Navarro were the subject of a nine count indictment charging them with: Count One, maintaining or operating a CDS production facility, contrary to the provisions of N.J.S.A. 2C:35-4 (first degree); Count Two, possession of Cocaine contrary to the provisions of N.J.S.A. 2C:35-10a(1) (third degree); Count Three, possession of cocaine within 1,000 feet of school property, contrary to the provisions of N.J.S.A. 2C:35-10 (third degree); Count Four, possession of cocaine in a quantity of one-half ounce or more, with the intent to distribute, contrary to the provisions of N.J.S.A. 2C:35-5b(2) (second degree); Count Five, possession of cocaine with intent to distribute within 1,000 feet of school property, contrary to the provisions of N.J.S.A. 2C:35-7 and N.J.S.A. 2C:35-5b(2) (third degree); Count Six, possession of heroin, contrary to the provisions of N.J.S.A. 2C:35-10a(1) (third degree); Count Seven, possession of heroin within 1,000 feet of school property, contrary to the provisions of N.J.S.A. 2C:35-10 (third degree); Count Eight, possession of heroin with the intent to distribute, contrary to the provisions of N.J.S.A. 2C:35-5b(3) (third degree); and Count Nine, possession of heroin with the intent to distribute within 1,000 feet of school property, contrary to the provisions of N.J.S.A. 2C:35-7 and N.J.S.A. 2C:35-5b(3) (third degree).
Defendants' motion to suppress evidence relevant to the indictment was denied. Thereafter, they were tried to a jury who found Eddie Saez and Orlando Navarro guilty of counts one through five of the indictment, and found Luis Saez guilty as to all counts of the indictment.
The State's motion for extended term sentencing of Luis and Eddie Saez was granted. Eddie Saez was sentenced to a presumptive 50 year extended term with a 20 year parole disqualifier, and a $150,000 fine. Luis Saez was sentenced to a presumptive 50 year prison term with a 17 year parole disqualifier and the same fine. Orlando Navarro was sentenced to a 15 year prison term *256 with a 5 year parole disqualifier and a $50,000 fine. Appropriate DEDR penalties, VCCB penalties and laboratory fees were imposed as to all defendants.
On appeal, the following issues are presented for resolution.
POINT I: DID THE TRIAL JUDGE ERR IN DENYING THE MOTION TO SUPPRESS EVIDENCE?
POINT II: DID THE TRIAL JUDGE ERR IN ADMITTING INTO EVIDENCE AN UNCERTIFIED SCHOOL ZONE MAP?[3]
POINT III: DID THE TRIAL JUDGE ERR IN DENYING DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL AT THE END OF THE STATE'S CASE?
POINT IV: DID THE TRIAL JUDGE ERR IN FAILING TO PERMIT THE DEFENDANTS TO CALL ASSISTANT MONMOUTH COUNTY PROSECUTOR PETER WARSHAW AS A WITNESS?
POINT V: DID THE ASSISTANT PROSECUTOR MAKE IMPROPER COMMENTS IN HIS SUMMATION?
POINT VI: DID THE TRIAL JUDGE ERR IN FAILING TO CHARGE "MANUFACTURING" BOTH AS TO N.J.S.A. 2C:35-4 AND N.J.S.A. 2C:35-5?
POINT VII: WAS THE SENTENCE IMPOSED ON DEFENDANT LUIS SAEZ and ORLANDO NAVARRO MANIFESTLY EXCESSIVE?
For the reasons stated herein, we affirm the convictions of all three defendants, and the sentence imposed as to defendants Luis Saez and Orlando Navarro.[4]
On May 15, 1990, Investigators Cassidy and West, affiliated with the Monmouth County Narcotics Strike Force, met with a citizen-informant, who at the time was living at 111A Fifth Avenue in Asbury Park, New Jersey. During the meeting, the informant related that she had observed narcotic activity several times over the last month, occurring in the basement of the adjoining residence, 111B Fifth Avenue. The building containing 111A and 111B Fifth Avenue is a one-story ranch type house with two separate entrances. The basement of the building is divided by a wooden wall constructed, as the trial judge observed, in a "somewhat *257 slap-dash [method] in that certain types of wood are used in one part, other types used in the area in question, vertical slats in one part, horizontal slats in another." The informant stated that she was able to observe the activity through holes or gaps in the wood partition.[5] The informant identified the occupant of the adjacent premises as defendant Eddie Saez. She said that Saez was accompanied by at least one other hispanic male, and that the activities usually took place around dinner time, although not on a daily basis. The informant had supplied information to the Task Force in the past, in connection with other apparently successful undercover investigations. She invited the investigators to observe the activity.
Based on the information received from the informant, a decision was made to set up an undercover investigation of the property. On May 16, 1990, Cassidy drove by the premises and made observations as to cars in the driveway, as well as the physical condition of the property. He also investigated into Eddie Saez's background, and discovered that Eddie Saez had previously been involved in narcotics related incidents.
On May 17, 1990, at approximately 5:40 p.m. Cassidy arrived at 111A Fifth Avenue, and was admitted to the basement by the tenant-informant. Cassidy testified at the suppression hearing that he was able to observe activity in the basement almost immediately upon his entry. He observed Eddie and Luis Saez, and another unknown hispanic male, in the process of "rerocking" cocaine. The process described is one of adding filler to cocaine and then adding water, thereafter compressing it until it becomes hard or rock-like. After the substance was formed into a rock-like appearance, the unidentified hispanic male cut the rocks into smaller pieces and placed them into small plastic bags.
Cassidy was able to make these observations through little holes and through horizontal cracks in the wooden wall. He also *258 testified that he used a piece of broken mirror that he had found in the basement, and, while holding it over his head, he could see the activity in the adjoining basement through a gap in the wall located above a furnace. Cassidy admitted that this activity could not have been seen through basement windows located in the adjoining basement because they had been painted over and covered with cloth material.
Approximately thirty minutes into his observations, Cassidy saw a dark colored Toyota Celica enter the driveway of 111B. The vehicle was driven by a person later identified as defendant Navarro. Navarro entered the basement and assumed the duties of the unidentified participant who then left the premises.[6]
During his observations of the activities, Cassidy would occasionally leave his point of observation so that he could transmit information to other members of the Task Force by radio. Upon returning to the basement wall after making one of those transmissions, Cassidy observed that the rerocking activity had ceased, and that Luis Saez and Orlando Navarro were leaving the premises, carrying an aerosol can and a package of aluminum foil. He immediately radioed that information to the surveillance team.[7]
After Cassidy's transmission, the investigation was taken over by members of the Task Force outside of the premises. The Toyota Celica was followed to a location in Asbury Park which was later determined to be the residence of defendant Luis Saez. Sergeant Campbell of the Task Force, and a uniformed Asbury Park police officer, approached the vehicle. Campbell testified that Luis Saez opened the door and attempted to run from the scene. Campbell apprehended him and obtained a small tin foil package from his hand. Campbell inferred from his observation that the package in all likelihood contained cocaine and placed *259 Saez under arrest. Navarro was also secured and arrested, and Asbury Park police officer Kirschenbaum was directed to take custody of the vehicle and drive it the impoundment area of the Asbury Park police station.
Kirschenbaum testified that as soon as he entered the vehicle, he could see an aerosol can on the floor on the passenger side of the car. At police headquarters, Kirschenbaum commenced a search of the vehicle, including the aerosol can. He noted that the can was a rather worn old can of Gunk, with a bottom which looked as though it had been cut. He shook the can, and determining it to be dead weight rather than sounding like an aerosol can, proceeded to remove the bottom. Inside the can, he found rock cocaine, as well as bags of heroin.
Although Luis Saez and Orlando Navarro were arrested on the evening of May 17, 1990, defendant Eddie Saez was not. Apparently the reason for not arresting him was so that further observations of his conduct could be made from the basement adjoining 111A. Subsequent observations by Cassidy did not prove fruitful. However, the informant apparently did see additional activity on or about May 25, 1990. Based upon that information a search warrant was issued on May 29, 1990.[8] The warrant, executed on June 3, 1990, produced evidence of narcotic activity: a blue mixing bowl, a spoon, pieces of aluminum foil, and a number of small plastic bags inside a larger bag. Defendant Eddie Saez was arrested at that time.

I.
Defendants contend on appeal, as they did in the trial court, that Cassidy's observations through the common wall of the basement constituted a search; and, because the search was warrantless and fell within none of the exceptions to the requirement for a warrant, it was unconstitutional. They further reason *260 that, because Cassidy's observations constituted an unconstitutional search, all arrests and subsequent searches were the fruits of the poisonous tree.
The critical question to be answered is whether the Fourth Amendment to the United States Constitution or Article I, paragraph 7 of the New Jersey Constitution required Investigator Cassidy to obtain a search warrant before making observations through the common wall dividing the basement of defendant Eddie Saez's premises from that of the informant. In the circumstances of this case, we perceive no difference in the outcome whether the issue is analyzed under federal or state law.
Under either constitutional provision, a search takes place when an expectation of privacy that society is prepared to consider reasonable is infringed. United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94 (1984); State v. Hempele, 120 N.J. 182, 198-200, 576 A.2d 793 (1990). Further, objective "[e]xpectations of privacy are established by general social norms." State v. Hempele, supra, 120 N.J. at 200, 576 A.2d 793, quoting Robbins v. California, 453 U.S. 420, 428, 101 S.Ct. 2841, 2847, 69 L.Ed.2d 744, 751 (1981) (plurality opinion), overruled on other grounds, United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). However, the search and seizure clause of neither the United States nor the New Jersey constitutions protects citizens from unreasonable searches by private parties. United States v. Jacobsen, supra, 466 U.S. at 113-14, 104 S.Ct. at 1656, 80 L.Ed.2d at 94; Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 95, 609 A.2d 11 (1992).
New Jersey has, in some instances, departed from the federal search and seizure analysis where we have found that our Constitution "affords our citizens greater protection against unreasonable searches and seizures than does the fourth amendment." State v. Hempele, supra, 120 N.J. at 195, 576 A.2d 793, quoting State v. Novembrino, 105 N.J. 95, 145, 519 A.2d 820 (1987). Indeed, Hempele was one such example. In that case, the New Jersey Supreme Court found that New Jersey citizens have a *261 reasonable expectation of privacy in garbage left at the curb for collection under the New Jersey Constitution, although they may not be afforded such protection under the federal constitution. Id., 120 N.J. at 215, 576 A.2d 793. This somewhat different conclusion, resulting from an analysis of the same facts under two nearly identical constitutional provisions, is explained in Hempele as being a result of "the diversity of laws, customs, and mores within [this country]." Id. at 197, 576 A.2d 793. However, regardless of the possibility of differing results stemming from an analysis under either the federal or State search and seizure clause, our Supreme Court, nonetheless, acknowledges a common ground for search and seizure protection reflecting "our societal understanding that certain areas deserve the most scrupulous protection from government invasion." Id. at 200, 576 A.2d 793, quoting Oliver v. United States, 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214, 224 (1984).
We are satisfied that both the United States Supreme Court and our own Supreme Court would conclude, under the facts of this case, that a person conducting activities within the confines of his own residence, and taking precautions to have those activities obscured from public view, would have a reasonable expectation of privacy in such activities. Defendants here did not knowingly expose their activities to public view. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Foley, 218 N.J. Super. 210, 527 A.2d 482 (App.Div. 1987); State v. O'Herron, 153 N.J. Super. 570, 380 A.2d 728 (App.Div. 1977), cert. denied, 439 U.S. 1032, 99 S.Ct. 637, 58 L.Ed.2d 695 (1978). While defendants may have been negligent in shielding their activities from their common neighbor, their expectations as to government intrusion can be viewed differently. As noted by our Supreme Court in Hempele,
[a]lthough a person may realize that an unwelcome scavenger might sort through his or her garbage, "such expectations would not necessarily include a detailed, systemized inspection of the garbage by law enforcement personnel."
[Hempele, supra, 120 N.J. at 205, 576 A.2d 793, quoting Smith v. State, 510 P.2d 793, 803 (Alaska), cert. denied, 414 U.S. 1086, 94 S.Ct. 603, 38 L.Ed.2d 489 (1973).]
*262 Thus, we conclude, contrary to the trial judge's findings, that defendants had a reasonable expectation of privacy in their premises. State v. Smith, 37 N.J. 481, 181 A.2d 761 (1962), cert. denied, 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963), relied upon by the trial judge, is clearly distinguishable. In that case, the detectives made an observation of activities in the defendant's apartment from a common hallway where any member of the public, including the police officers, had a right to be. In that instance, the defendant made insufficient effort to protect his conduct from public view. That is not the situation in the current case. Here, defendants painted and covered the windows exposed to the public.
However, the conclusion that defendants had an expectation of privacy as to government intrusion does not end the inquiry. Although a warrantless search is prima facie invalid, the invalidity may be overcome if the search falls within one of the specific exceptions created by decisional law. State v. Hill, 115 N.J. 169, 173, 557 A.2d 322 (1989). One of those exceptions recognized both by our Supreme Court and the United States Supreme Court is the "third party intervention" exception discussed in United States v. Jacobsen, supra. State v. Hill, supra, 115 N.J. at 173, 557 A.2d 322. See also State v. Mollica, 114 N.J. 329, 355, 554 A.2d 1315 (1989).
Contrary to defendants' argument, this case is not controlled by State v. Hempele, supra. Although Hempele found a reasonable expectation of privacy in garbage, and further found that the police inspection of such garbage constituted an unreasonable search, the Court had no occasion to decide whether there would have been a search had a scavenger or refuse collector (third party intervenors) observed contraband, and subsequently invited the police to observe what they had seen. No case in our jurisdiction has addressed such an issue. However, the United States Supreme Court did so in Jacobsen.
In United States v. Jacobsen, supra, employees of Federal Express damaged a package that had been placed in its care for *263 delivery to a third party. Their examination of the damaged container revealed a ten inch tube made of silver duct tape. The office manager cut open the tube and found a zip lock plastic bag containing three other plastic bags. The inner most bags contained about six and one-half ounces of white powder. Obviously suspecting drug activity, they then notified the Drug Enforcement Administration.
Upon receiving the information, a federal agent arrived at the Federal Express premises. By that time, the plastic bags had been placed back in the tube and the tube placed back in the carton. The agent saw that one end of the tube had been slit open. He removed the four plastic bags from the tube and saw the white powder. He then opened each of the four bags and removed a trace of the white substance with a knife blade. A field test identified the substance as cocaine. Defendant was arrested as a result of the observations made by the agent.
The United States Supreme Court had no difficulty finding that defendant had an expectation of privacy in the package delivered to Federal Express. However, it determined that the invasion of defendant's privacy was occasioned by private action, and, regardless of whether that invasion was accidental or deliberate, reasonable or unreasonable, it did not violate the Fourth Amendment because of its private character. United States v. Jacobsen, supra, 466 U.S. at 115, 104 S.Ct. at 1657, 80 L.Ed.2d at 95. The Court reasoned:
Respondents do not dispute that the Government could utilize the Federal Express employees' testimony concerning the contents of the package. If that is the case, it hardly infringed respondents' privacy for the agents to reexamine the contents of the open package by brushing aside a crumpled newspaper and picking up the tube. The advantage the Government gained thereby was merely avoiding the risk of a flaw in the employees' recollection, rather than in further infringing respondents' privacy. Protecting the risk of misdescription hardly enhances any legitimate privacy interest, and is not protected by the Fourth Amendment. Respondents could have no privacy interest in the contents of the package, since it remained unsealed and since the Federal Express employees had just examined the package and had, of their own accord, invited the federal agent to their offices for the express purpose of viewing its contents. The agent's viewing of what a *264 private party had freely made available for his inspection did not violate the Fourth Amendment.
[Id. at 119-20, 104 S.Ct. at 1659-60, 80 L.Ed.2d at 98.]
The Fourth Amendment is not implicated unless the police officer expands the scope of the invasion and uses "information with respect to which the expectation of privacy has not already been frustrated." Id. at 117, 104 S.Ct. at 1658-59, 80 L.Ed.2d at 97. Under the circumstances of that case, the Jacobsen Court concluded that the agent's viewing of the contents of the package, as well as his subsequent testing of its contents, did not infringe upon a legitimate expectation of privacy because a prior invasion of privacy had already occurred, and, thus, was not a search within the meaning of the Fourth Amendment. Id. at 120, 104 S.Ct. at 1660, 80 L.Ed.2d at 98.
Applying the principles of Jacobsen to this case, we conclude that the initial invasion of defendants' privacy was occasioned by the private action of the citizen informant. Defendants do not contend that the citizen informant was an agent or employee of the government. See State v. Mollica, supra, 114 N.J. at 355, 554 A.2d 1315. Clearly, the informant could have testified, as could the Federal Express employees in Jacobsen, as to her observations of defendants' conduct. The police officer was invited by the informant to observe what she had seen. His observations went no further than that of the informant's in frustrating or infringing upon defendants' privacy. Thus, we conclude that the police conduct under these circumstances was not an unreasonable search in violation of either the State or the federal constitutions.

II.
Defendants Saez contend that the trial judge erred by admitting "an uncertified map" into evidence in connection with their prosecution under N.J.S.A. 2C:35-7. We find no error and affirm.
In order to prove the location of "school property" under N.J.S.A. 2C:35-7, the State may produce "prima facie evidence of *265 the location and boundaries of those areas" by use of "a map produced or reproduced by any municipal or county engineer for the purpose of depicting the location and boundaries" of such areas "provided that the governing body of the municipality or county has adopted a resolution or ordinance approving the map[.]" N.J.S.A. 2C:35-7. The statute does not require that the map itself contain a certification of its authenticity. The statute merely requires the map to be admitted "upon proper authentication[.]" N.J.S.A. 2C:35-7.
In this case the school zone map marked into evidence was properly authenticated by reference to the ordinance which adopted the map. The ordinance itself was certified by the municipal clerk. Such mode of authentication was "sufficient to sustain a finding of its authenticity[.]" Evid.R. 67.

III.
Defendants maintain that the State did not present sufficient evidence to establish that the Saez defendants were guilty of maintaining or operating premises used for the "manufacture" of certain controlled dangerous substances in violation of N.J.S.A. 2C:35-4, a first degree offense. Both defendants maintain that the evidence was insufficient in that the State failed to prove the presence of "other types of paraphernalia such as large scales" or "any amounts of money."
"Manufacture" is defined in N.J.S.A. 2C:35-2 as
the production, preparation, propagation, compounding, conversion or processing of a controlled dangerous substance or controlled substance analog, either directly or by extraction from substances of natural origin, or independently by means of chemical synthesis, or by combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container[.]
That definition is incorporated in N.J.S.A. 2C:35-4. See Cannel, New Jersey Criminal Code Annotated, legislative Comment on N.J.S.A. 2C:35-4 (1987). In State v. Miles, 231 N.J. Super. 27, 555 A.2d 1 (App.Div. 1989) this court found that where defendant purchased cocaine and heroin in bulk, diluted the substances with *266 cutting agents, and packaged them for sale in units of small quantities, such activities fell within the purview of the prohibition against manufacturing.
Investigator Cassidy described defendants' activities as the process of "rerocking" cocaine. That process includes the adding of filler to cocaine, mixing it, adding water, and then compressing it until the mixture becomes hard, or rock-like. The word manufacture "includes any packaging or repackaging of the substance." N.J.S.A. 2C:35-2. The activities observed by Cassidy sufficiently described a processing and repackaging facility. Such activity is within the purview of the statute. Giving the State the benefit of all favorable inferences, a reasonable jury could find guilt beyond a reasonable doubt. State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967). Therefore, the trial judge did not err in denying the Saez defendants' motion for judgment of acquittal.

IV.
During his initial trial testimony, Investigator Cassidy indicated that he had seen defendants Luis Saez and Orlando Navarro at 111B Fifth Avenue subsequent to their arrest on May 17, 1990, and before the search warrant was executed on June 3, 1990. In fact, those defendants were incarcerated during that period of time and, therefore, could not have been seen by Cassidy.
When Cassidy was recalled to the witness stand, he testified that he had been mistaken concerning those observations. His explanation was as follows:
After I left the courtroom, ... I realized I had made a mistake. When Prosecutor Warshaw left the courtroom, I advised him of that and he advised me that he was aware of that and it was already brought to his attention and instructed me to check with the record.
Defendants made an application to call the assistant prosecutor as a witness for the purpose of proving that the mistake in Cassidy's initial testimony was brought to his attention by the assistant prosecutor, rather than Cassidy's self-realization that he had made a mistake. The trial judge denied the application *267 observing that such testimony would juxtapose the credibility of Cassidy against that of the assistant prosecutor. He believed that the "highly unusual procedure" would run the risk of jeopardizing the assistant prosecutor's ability to prosecute the case. Although he found that Cassidy's credibility was a relevant issue, he concluded that the prejudice outweighed the probative value under Evid.R. 4. We find no abuse of discretion in that ruling and affirm essentially for the reasons stated by the trial judge.

V.
The Saez defendants contend that the prosecutor made improper remarks in his summation impacting both defendants' right not to testify and the trial tactics used by their respective attorneys. Our review of the prosecutor's summation satisfies us that his comments concerning Investigator Venezia's testimony relative to defendants' intent to distribute the drugs was no more than fair comment on the strength and credibility of that testimony. He did not suggest that the defendants should have been expected to testify in order to refute Venezia's testimony. He merely observed that Venezia's testimony was unimpaired by cross-examination. The comments were clearly not egregiously inappropriate, and did not have the capability of denying defendants a fair trial. State v. Biegenwald, 106 N.J. 13, 40, 524 A.2d 130 (1987).

VI.
Defendants Saez contend that, although they were indicted for maintaining or operating a controlled dangerous substance production facility under N.J.S.A. 2C:35-4, the trial judge should also have charged the jury with the manufacturing offense set forth in N.J.S.A. 2C:35-5. Defendants admit that the definition of "manufacture" contained in N.J.S.A. 2C:35-2 applies to both offenses. They do not contend that the offense described in N.J.S.A. 2C:35-5 is a lesser included offense of the offense charged N.J.S.A. 2C:35-4. Indeed, it is not. Although N.J.S.A. *268 2C:35-5 differentiates between a first and second degree offense depending upon the weight of the cocaine, N.J.S.A. 2C:35-4 is a first degree offense regardless of the amount of cocaine produced. In a prosecution under N.J.S.A. 2C:35-4, the amount of cocaine involved is relevant only to prove that the substance being produced is not for personal use. That is so because N.J.S.A. 2C:35-2 exempts from the definition of manufacture "the preparation or compounding of a controlled dangerous substance or controlled substance analog by an individual for his own use[.]" N.J.S.A. 2C:35-2.
The Legislature was obviously aware of the interrelationship between N.J.S.A. 2C:35-4 and N.J.S.A. 2C:35-5 and elected to give the State the choice of the statute under which it elected to proceed. The legislative commentary to 2C:35-4 confirms our understanding:
It is expected that many persons covered under this section could also be prosecuted for the separate offense of manufacturing, distributing or dispensing a controlled dangerous substance in violation of N.J.S.A. 2C:35-5. Unlike 2C:35-5, however, the offense defined in this section is designated as a first degree crime without regard to the quantity or purity of the controlled substances involved, provided that the particular substance produced in the illegal laboratory was one of those which are specifically identified in this section.
[Cannel, New Jersey Criminal Code Annotated, 1987 Legislative Commentary on N.J.S.A. 2C:35-4.]
The legislative intent in passing N.J.S.A. 2C:35-4 was to prosecute
those offenders who maintain or operate any premises, place or facility which is used for the unlawful manufacture of certain specified controlled substances ... which includes ... cocaine.

[Id.]
The Legislature considered such conduct to be
an especially serious offense, since such commercial operations have become indispensable and prolific source for controlled substances ... which then enter the illicit stream of commerce and are distributed throughout the State.

[Id.]
Although the facility maintained in defendant Eddie Saez's basement was certainly not sophisticated, the "rerocking" process *269 described by Cassidy and the amount produced was not for personal use as opined by Investigator Venezia. As such, defendants' conduct clearly met the criteria of "manufacture" under 2C:35-2 in the context of maintaining a facility for such purpose as proscribed by 2C:35-4. State v. Miles, supra, 231 N.J. Super. at 30, 555 A.2d 1.
Because N.J.S.A. 2C:35-5 is not a lesser included offense of N.J.S.A. 2C:35-4, the trial judge was not obligated to instruct the jury on that statute. See State v. Crisantos, 102 N.J. 265, 508 A.2d 167 (1986). The State had sufficient evidence to prove a violation of N.J.S.A. 2C:35-4. Thus, the trial judge did not err in refusing to instruct the jury on the offense described in N.J.S.A. 2C:35-5.

VII.
Defendant Luis Saez and defendant Orlando Navarro contend that the sentences imposed were excessive. Luis Saez received a presumptive extended term sentence, and Navarro received the presumptive sentence for his first degree conviction under N.J.S.A. 2C:35-4.
Saez contends that he was not the "ringleader," but a "pawn" who took orders from his brother. He also points to his family circumstances, and the fact that he is a victim of drugs, to argue that the presumptive sentence imposed was excessive. Navarro contends that the trial judge inappropriately double counted certain aggravating factors, whereas, in fact, the mitigating factors outweighed the aggravating factors and required a sentence less than the presumptive term. We have reviewed the record in light of the arguments and conclude that they are without merit. There was no basis in this record for the trial judge to have ordered a prison term of less than the presumptive term for either defendant. See State v. Hodge, 95 N.J. 369, 471 A.2d 389 (1984).
The judgments of conviction under review are affirmed in all respects.
*270 D'ANNUNZIO, J.A.D., dissenting.
Regarding the visual surveillance by the police of Eddie Saez's basement, I agree with the majority's preliminary conclusion that Eddie Saez had a reasonable and legitimate expectation of privacy as to his activities in the basement of his residence. I disagree, however, with the majority's application of the "third party intervention" exception to the facts of this case.
United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), is an example of the typical third-party intervention case. In that case, the reader will recall, employees of a shipping company had examined the contents of a damaged container, going so far as to open a duct-tape tube. Their examination revealed six and a half ounces of white powder, suspected to be illicit drugs. Based on the information provided by the employees, a Drug Enforcement Administration (DEA) agent reexamined the contents of the damaged containers. Because the initial violation of defendant's privacy was the result of private action, the Court found no Fourth Amendment violation in the agent's reexamination of the package.
United States v. Moore, 943 F.2d 884 (8th Cir.1991), is another example of the third party intervention exception. In that case, Halbert, a shipping company employee, took a loosely wrapped vacuum cleaner box to a re-wrap station. Halbert observed a wad of currency when he opened the box. He resealed the box and reported his find to the DEA, whose agent reopened the box to observe the currency. The court of appeals affirmed the trial court's denial of defendant's motion to suppress the currency because the agent's search "did not exceed the scope of Halbert's initial private search." Id. at 888.
In United States v. Walsh, 791 F.2d 811 (10th Cir.1986), an airline employee found a briefcase near a baggage carousel at an airport. Another airline employee opened the briefcase in search of identification because its exterior contained no information regarding ownership. The case contained illegal firearms and was turned over to an agent of the Bureau of Alcohol, Tobacco and *271 Firearms, who also examined the case's contents. Relying on United States v. Jacobsen, supra, the court held that because the government agent merely had repeated what the airline's employees had already done, there was no Fourth Amendment violation. Thus, "[i]t was virtually certain that the government's search would not reveal anything more than the government agent had already been told by the carrier." Id. at 815. As in Jacobsen, the owner's privacy interest "had been eliminated because the package was unsealed and had been inspected by the carrier's employees." Ibid.
United States v. Bomengo, 580 F.2d 173 (5th Cir.1978), cert. denied, 439 U.S. 1117, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), decided before Jacobsen, involved the discovery of illegal firearms in a closet in an apartment. The discovery was made by the chief engineer of an apartment complex when he entered the apartment to investigate water leakage. Entry was made only after unsuccessful attempts to locate the tenant. After discovering the firearms, apartment security contacted the police. A detective arrived, entered the apartment at the security director's invitation, and observed the firearms. The court held that "a police view subsequent to a search conducted by private citizens does not constitute a `search' within the meaning of the Fourth Amendment so long as the view is confined to the scope and product of the initial search." Id. at 175 (emphasis added).
The underscored language in the quotation from Bomengo is the key to the inapplicability of third party intervention to the present case. In Jacobsen, Moore, Walsh and Bomengo, the breach of privacy by the private searches revealed objects, some of which were illegal. The government agents saw the same objects. Thus, the inspections by the government agents did not expand the scope or the product of the initial private searches. However, where the government expands the private search, the third-party intervention exception no longer applies to the fruits of the expanded search.
*272 Walter v. United States, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), is an exemplar of this distinction. That case involved the erroneous delivery by a shipping company of twelve cartons to "L'Eggs Products, Inc." instead of to "Leggs, Inc." Employees of L'Eggs Products opened the boxes and found film canisters, the labeling of which indicated that they contained scenes of homosexual activity. The employees did not screen the films or otherwise view their content. L'Eggs Products informed the Federal Bureau of Investigation, whose agents picked up the cartons and viewed the films utilizing a projector. A majority of the Court held that the viewing of the films without a warrant was a search which violated the Fourth Amendment.
In Walter, Justice Stevens distinguished the third-party intervention cases on the ground that the FBI's screening of the films was a separate search which had expanded the scope of the private search. Justice Stevens stated:
The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search. That separate search was not supported by any exigency, or by a warrant even though one could have easily been obtained.
........
The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy. The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection. Since the additional search conducted by the FBI  the screening of the films  was not supported by any justification, it violated that Amendment.
[Id. at 657-59, 100 S.Ct. at 2402-03, 65 L.Ed.2d at 418-419.]
In the present case, the police were not invited to view specific, immutable objects that the tenant-informant had reduced to possession. The police were invited to participate in the surveillance of a basement and any activities which might occur in that basement during the police surveillance. Because no one could predict with certainty what the police would see, unlike the Jacobsen line of cases, each moment of surveillance was a new *273 invasion of privacy. The basement activities to be seen from the tenant-informant's vantage point could have included licit as well as illicit behavior, activities of other members of the suspect's family and even private intimate behavior.
Beyond the third-party intervention cases, there is a line of cases involving aural and visual surveillance by law enforcement authorities which tends to support the State's position in the present case. In those cases the police were engaged in surveillance from positions where they had a right to be.
United States v. Whaley, 779 F.2d 585 (11th Cir.1986), cert. denied, 479 U.S. 1055, 107 S.Ct. 931, 93 L.Ed.2d 982 (1987), is one of those cases. In that case the government had reason to believe that equipment and chemicals capable of producing synthetic cocaine had been delivered to defendant's home. Defendant, a medical doctor, lived on a three-acre lot adjacent to a canal. There was limited access to the community and to the canal. However, defendant's neighbor gave DEA agents permission to base their surveillance on his property which was across the canal from defendant's house. From their vantage point the agents were able to look into defendant's basement through large, uncurtained windows. Based on their observations the agents obtained a search warrant. The court of appeals affirmed the denial of defendant's suppression motion because defendant's expectation of privacy was not reasonable in light of the fact that defendant's basement activities "could be viewed with the naked eye from a position on the canal or on neighboring property adjoining the canal." Id. at 590.
Similarly, in People v. Wright, 41 Ill.2d 170, 242 N.E.2d 180 (1968), cert. denied, 395 U.S. 933, 89 S.Ct. 1993, 23 L.Ed.2d 448 (1969), the court affirmed denial of a motion to suppress. There, the officer, standing on a right of way belonging to a public transit authority, was one to three feet from the rear windows of a house in which illicit gambling activities were being conducted. Based on what he saw through an opening in the window curtains, as well as on the conversations he heard while at the window, the officer *274 had probable cause to believe that a crime was being committed. See also Commonwealth v. Busfield, 242 Pa.Super. 194, 363 A.2d 1227 (1976) (no reasonable expectation of privacy where police, located on neighboring property, could see into defendant's house through sheer curtains covering kitchen window); Commonwealth v. Hernley, 216 Pa.Super. 177, 263 A.2d 904 (1970) (not an unlawful search for FBI to use binoculars from a ladder situated on railroad tracks to look inside commercial building through windows located high off the ground), cert. denied, 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971).
Aural surveillance has been upheld in similar circumstances. For example, in United States v. Mankani, 738 F.2d 538 (2d Cir.1984), a DEA agent occupying a hotel room adjacent to defendant's was able to hear conversations in defendant's room through the use of a small pre-existing hole in the wall between the rooms. Apparently the hole resulted from changes the hotel had made in its room telephone service. The court determined that there was a diminished expectation of privacy in a hotel room, and concluded:
In short, it is the transitory nature of such places, commonly understood as such, that diminishes a person's justifiable expectation of privacy in them. Since a hotel room is exposed to others, it is unlike a "house," i.e., a place where one lives. Therefore, there is an accepted loss of privacy when one occupies a public place, somewhat akin to a conversation in the street, and the intervention of a human ear in those surroundings is the kind of intrusion one should anticipate. A number of courts, including our own, have concluded that the intrusion of a human ear in similar circumstances is not an unlawful "seizure" of a conversation in a hotel or motel room. See e.g., United States v. Agapito, supra [620 F.2d 324 (2d Cir.1980)]; United States v. Sin Nagh Fong, 490 F.2d 527, 530 (9th Cir.), cert. denied, 417 U.S. 916, 94 S.Ct. 2618, 41 L.Ed.2d 220 (1974); United States v. Ortega, supra [471 F.2d 1350 (2d Cir.1972)]; Ponce v. Craven, 409 F.2d 621, 625 (9th Cir. 1969).

[Id. at 544.]
See also State v. Benton, 206 Conn. 90, 536 A.2d 572, 575 (1988) ("Conversations ... in a tone audible to the unaided ear of a person located in a place where that person has a right to be, and where a person can be expected to be, are conversations knowingly exposed to the public.").
*275 Where, however, a suspect had engaged in unusual efforts to protect his privacy, or the police had engaged in unusual efforts to pierce the veil of privacy, it has been held that constitutional guarantees against unreasonable searches and seizures were violated. In Commonwealth v. Panetti, 406 Mass. 230, 547 N.E.2d 46 (1989), the court held that the police violated the Massachusetts Constitution when an officer, with the landlord's permission, entered a crawl space under defendant's first floor apartment. From that vantage point, the officer overheard conversations relating to the sale of drugs. The court grounded its ruling on a determination that defendant had a reasonable expectation that no one would be in the crawl space. The court was satisfied that the crawl space was an area "where neither neighbors nor the public would ordinarily be expected to be." Id., 547 N.E.2d at 48.
In Lorenzana v. Super. Ct. of Los Angeles Cty., 9 Cal.3d 626, 108 Cal. Rptr. 585, 511 P.2d 33 (1973), a policeman positioned himself on a grassy area adjacent to defendant's house, an area to which the public had not been invited, and peeked through a two-inch gap between the bottom of a drawn shade and the windowsill. The California Supreme Court, after reviewing relevant case law, ordered that the evidence generated by the surveillance be suppressed because the observations were made from a position to which neither the police or the public had been invited, expressly or impliedly.
The fact that apertures existed in the window, so that an unlawfully intruding individual so motivated could spy into the residence, does not dispel the reasonableness of the occupants' expectation of privacy. To the contrary, the facts of this case demonstrate that by drawing the window shade petitioner Lorenzana exhibited a reasonable expectation to be free from surveillance conducted from a vantage point in the surrounding property not open to public or common use. Surely our state and federal Constitutions and the cases interpreting them foreclose a regression into an Orwellian society in which a citizen, in order to preserve a modicum of privacy, would be compelled to encase himself in a light-tight, air-proof box. The shadow of 1984 has fortunately not yet fallen upon us.
[Id., 108 Cal. Rptr. at 593, 511 P.2d at 41 (citations omitted).]
See also Pate v. Mun. Ct. for Modesto Judicial District, 11 Cal. App.3d 721, 89 Cal. Rptr. 893 (1970) (police violated Fourth *276 Amendment by climbing trellis and peeking through a one-inch opening in drawn drapes of motel room).
In the present case, defendant had gone to unusual lengths to protect the privacy of his activities. He conducted those activities in his basement, by definition a place affording only limited opportunities for scrutiny by unauthorized persons. Defendant enhanced the basement's inherent privacy by shielding its windows. Unknown to defendant, however, there were chinks in his wall of privacy which permitted a neighbor to place defendant's basement under surveillance. The neighbor's surveillance did not violate the Fourth Amendment because it was private action.
The police surveillance was government action, thereby implicating constitutional guarantees against unreasonable searches. However the police were lawfully in the adjoining basement, having been invited to that vantage point by defendant's neighbor. Thus, this case does not fit neatly into any particular category for Fourth Amendment analysis.
Utilizing Fourth Amendment cases for guidance, State v. Hempele, 120 N.J. 182, 197-98, 576 A.2d 793 (1990), however, I am persuaded that the police surveillance in this case was an unlawful search under Article I, paragraph 7 of the New Jersey Constitution which in some circumstances affords greater protection against government searches than the Fourth Amendment. Id. at 195, 576 A.2d 793; State v. Novembrino, 105 N.J. 95, 145, 519 A.2d 820 (1987); State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982).
"[T]he New Jersey Constitution requires only that an expectation of privacy be reasonable." Hempele, supra, 120 N.J. at 200, 576 A.2d 793. "In determining the reasonableness of an expectation of privacy ... we start from the premise that `[e]xpectations of privacy are established by general social norms.'" Ibid. (quoting Robbins v. California, 453 U.S. 420, 428, 101 S.Ct. 2841, 2847, 69 L.Ed.2d 744, 751 (1981), overruled on other grounds, United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). One of the factors relied on in determining the reasonableness of an expectation of privacy is "our societal understanding that certain areas deserve the most scrupulous protection from *277 government invasion." Oliver v. United States, 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214, 224 (1984). One of those areas is the home, which has been protected by "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." Payton v. New York, 445 U.S. 573, 601, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639, 660 (1980). It has been said that the protection of the home is at "the very core" of constitutional protection against "unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734, 739 (1961). See State v. Hutchins, 116 N.J. 457, 463, 561 A.2d 1142 (1989); State v. Bolte, 115 N.J. 579, 583-85, 597, 560 A.2d 644 (1989) (hot pursuit of person in connection with motor vehicle and disorderly persons offenses did not justify warrantless entry into suspect's home to effect arrest), cert. denied, 493 U.S. 936, 110 S.Ct. 330, 107 L.Ed.2d 320 (1989).
The walls of a home ordinarily conceal activities within the house from plain view except to the extent that those activities readily may be viewed by members of the public through unprotected openings as in Whaley, supra, Wright, supra, Busfield, supra, and Hernley, supra. The police surveillance in the present case was an egregious breach of the privacy and security afforded by the home to its occupants and violated our societal expectations regarding appropriate conduct by our fellow citizens as well as by the police. It was chillingly evocative of surveillance techniques favored by governments under which rights of individual privacy have a low priority. I conclude, therefore, that defendant's expectation of privacy in his basement was reasonable, despite the neighbor's ability to survey surreptitiously the basement's interior.
I am also persuaded that the neighbor's surveillance opportunity did not nullify the warrant requirement. Cf. Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord's request that police enter locked tenant-house to investigate suspected illegal still, did not vitiate warrant requirement). The fact that the basement was not perfectly secure is not dispositive. See Hempele, supra, 120 N.J. at 204-06, 576 A.2d *278 793. "Unreasonable police searches are often impermissible in areas accessible to other third parties." Id. at 204, 576 A.2d 793. Cf. O'Connor v. Ortega, 480 U.S. 709, 718, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714, 723-24 (1987) (public employee had a reasonable expectation of privacy in his office, desk and file cabinets). Our Supreme Court has recognized that "a person's expectation of privacy can differ in regard to different classes of people." Hempele, supra, 120 N.J. at 205, 576 A.2d 793. Thus, despite the potential that a neighbor or other person might sort through or otherwise examine a person's garbage, the police may not do so without a warrant. "There is a difference between a homeless person scavenging for food and clothes, and an officer of the State scrutinizing the contents of a garbage bag for incriminating materials." Id. at 205-06, 576 A.2d 793.
I reject the State's reliance on the plain view doctrine. Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); State v. Bruzzese, 94 N.J. 210, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). Although the police had the right to be in the informant's basement, the issue is whether the police had the legal right, without a warrant, to breach, literally and figuratively, defendant's privacy wall. But cf. State v. Smith, 37 N.J. 481, 181 A.2d 761 (1962), cert. denied, 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963), in which the Court held that the police did not violate the Fourth Amendment when officers peered into an apartment through either a keyhole or a crack in the door while they were standing in a common hallway. Though valuable as guidance, Smith is not binding because the Court was applying the Federal Constitution, not the New Jersey Constitution.[1] Moreover, there is a different expectation of privacy regarding the security afforded by a door accessible from a common hallway and the security afforded by a basement wall.
*279 I conclude that the police surveillance of defendant's basement violated a legitimate and reasonable expectation of privacy, one which society will recognize as valid, and, therefore, was a search requiring a warrant.[2] Accordingly, the fruits of that search should have been suppressed. Those fruits include defendants' activities in the basement observed by the police as well as the aerosol can and its contents and the tin foil packages found in Louis Saez's hand when the officers stopped the Toyota. I would reverse the convictions and remand the case for further proceedings.
NOTES
[1] Appellant Navarro's case was not argued.
[2] The above matters were calendared back-to-back because they arose out of the same indictment and involved similar issues. They have been consolidated for the purpose of this opinion.
[3] Defendant Navarro does not join defendants Saez in issues II through VI.
[4] At the request of the Appellate Division Points II through VII of the opinion have been omitted from publication.
[5] The holes and gaps through which the observations were made were confirmed by photographs introduced at the suppression hearing.
[6] The unidentified participant was never apprehended.
[7] Apparently, aerosol cans are routinely used to transport drugs by cutting open the bottom of the can, inserting the substance, and replacing the false bottom to the can.
[8] The first warrant, issued on May 18, 1990 based upon information of the events of May 17, 1990, was not executed and was permitted to lapse.
[1] I also note that while Smith was pending in the New Jersey Supreme Court, the United States Supreme Court decided Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), thereby extending the exclusionary rule to state courts.
[2] In addition to being constitutionally required, a warrant issued by a neutral judicial officer would have permitted judicial supervision of the surveillance. For example, surveillance times may have been limited to the hours when, according to the informant, drug activity in the basement was most likely to occur. R. 3:5-3(a). The duration of the warrant could have been limited to less than the ten days permitted by rule. R. 3:5-5(a). Judicial supervision of covert surveillance is also important because, unlike a physical search, the subject may never know that the police had violated the privacy of his home.