71 A.3d 212

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. RICKY WRIGHT, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued January 28, 2013—Decided July 25, 2013.

Before Judges PARRILLO, SABATINO and MAVEN.

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora,* Public Defender,

attorney; *Sylvia Orenstein,* Assistant Deputy Public Defender, of counsel and on the brief).

*Jeanne Screen,* Deputy Attorney General, argued the cause for respondent (*Jeffrey S. Chiesa,* Attorney General, attorney; *Ms. Screen,* of counsel and on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

This criminal appeal concerns the "third-party intervention" doctrine, often referred to as the "private search" doctrine. In certain instances, New Jersey courts and various other jurisdictions have applied the doctrine to authorize the police to inspect or search a defendant's property without a warrant, so long as the police do not exceed the scope of the private actor's intrusion that led to the police's involvement.

The trial court relied upon this doctrine in denying defendant's motion to suppress drugs and other incriminating evidence seized by the police from his girlfriend's apartment. The landlord had entered the apartment at the girlfriend's request to repair a leak. While he was there, the landlord observed drugs on a night stand and, in fear, he called the police. The police responded to the scene, were let into the apartment by the landlord, and confirmed his observation of the drugs and other contraband in open view. The girlfriend then arrived and the police secured her consent to a search of the apartment, through which they found a gun and other evidence of criminal conduct.

Given the heightened protection that the Fourth Amendment of the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution accord to the privacy of residential premises, we join with several other courts in limiting the extent to which the third-party intervention doctrine may authorize warrantless police searches of private residences. In particular, we hold that, at the very least, the doctrine does not apply in situations where the third party who provides the police with

access to a dwelling has entered it unlawfully or otherwise in violation of the resident's property rights or her reasonable privacy expectations. Apart from that limitation, the doctrine also should not apply if the totality of the intrusion by the private party and law enforcement officials is objectively unreasonable.

Viewed in light of the motion judge's credibility findings, the record establishes that no such violation of the tenant's reasonable privacy expectations or property rights occurred here. The landlord entered the apartment at the tenant's invitation to address ongoing water damage and a potential health and safety hazard. He acted justifiably in letting the police into the apartment after observing illegal drugs within the premises in open view. We also find it significant that the police did not go beyond the physical scope of the landlord's entry into the premises until they first obtained the tenant's valid consent to a full search of the premises. The conduct of both the landlord and the police in these particular circumstances was reasonable and did not offend the federal and state constitutions.

Consequently, for the reasons amplified in this opinion, the third-party intervention doctrine justifies the warrantless search that was performed in this case. We therefore affirm the trial court's suppression ruling and defendant's ensuing conviction.

## I.

The eight-count indictment charged defendant Ricky Wright ("defendant") and his girlfriend, co-defendant Evangeline James, with third-degree possession of cocaine, a controlled dangerous substance ("CDS"), *N.J.S.A.* 2C:35–10a(1) (count one); second-degree possession of cocaine, with intent to distribute that CDS, *N.J.S.A.* 2C:35–5b(2) (count two); third-degree possession of cocaine with intent to distribute that CDS within a school zone, *N.J.S.A.* 2C:35–7 (count three); second-degree possession of a firearm in the course of committing a CDS offense, *N.J.S.A.* 2C:39–4.1a (count four); second-degree possession of a firearm for an unlawful purpose, *N.J.S.A.* 2C:39–4a (count five); and fourth-

degree possession of a prohibited weapon or device, specifically body armor piercing bullets, *N.J.S.A.* 2C:39–3f [1] (count six). In addition, the indictment charged defendant alone with two more offenses: third-degree making of terroristic threats, *N.J.S.A.* 2C:12–3 (count seven); and second-degree tampering with a witness or informant, *N.J.S.A.* 2C:28–5a (count eight).

## A.

The State's evidence against defendant substantially consisted of drugs, a gun, and other contraband seized by the police on March 30, 2009 through a warrantless search of an apartment in Asbury Park. The building had two apartment units. James leased the downstairs apartment and resided there with her three minor children, the youngest of whom was also defendant's child. Although he was not a co-tenant on the lease, the record indicates that defendant stayed in the apartment several days each week.[2]

The circumstances relating to the search and seizure were developed at a three-day suppression hearing held before the trial judge, Hon. Ronald Lee Reisner, J.S.C., in July and August 2010. The State presented testimony at the hearing from three Asbury Park police officers: Carl Christie, Lorenzo Pettway, and Eddie Raisin. In addition, the State presented, without objection [3] by defense counsel, two videotaped interviews of the landlord, Alfred Santillo, conducted at the police station later in the day of the search. Defendant did not testify himself at the suppression

---

[1] The indictment erroneously cites *N.J.S.A.* 2C:39–3e. That error is not at issue in this appeal.

[2] Apparently, by the time of the 2010 suppression hearing, James and defendant were no longer living together and she had filed a complaint against him, the specific nature of which is not disclosed in the record.

[3] Early in the hearing, defense counsel did object to the officers testifying about hearsay statements that had been made to them by the landlord. The trial judge overruled that objection, rightly noting a judge hearing a suppression motion relating to the admissibility of evidence may consider hearsay or other inadmissible proof. *See N.J.R.E.* 101(a)(2)(E).

hearing, but presented testimony from James, whom his attorney had subpoenaed.

It is undisputed that on Sunday evening, March 29, 2009, James called Santillo to report a leak in the kitchen ceiling of her apartment and asked him to address the problem. It is also undisputed that Santillo entered the apartment the following day, March 30, along with a plumber, Nicholas Alexo, for the purpose of repairing the leak.

More specifically, according to Santillo's account to the police,[4] he received the call from James at about 5:00 p.m. on March 29. Surmising that the leak came from a broken water pipe, Santillo instructed James to turn off the main water valve, although she apparently was unable to do so. According to Santillo, he assured James that he would be "there in the morning to fix it," and she responded that was "fine."

The following morning, March 30, Santillo and Alexo arrived at the apartment at around noon. No one was home. According to Santillo, he called James when he arrived, told her that he was going in to fix the leak, and she responded, "okay." Santillo then waited approximately a half hour. When James did not appear, he opened the door and went into the apartment with Alexo. Santillo noted that he similarly had let himself in the apartment two or three times in the past. Once they got inside, he and Alexo saw that the ongoing leak in the kitchen was "pretty bad."

Concerned that the leak might not be confined to the kitchen, Santillo asked Alexo to go into the bedrooms to look for additional leaks. The water pipes in the ceiling of the kitchen led to the rear bedroom. While in the master bedroom checking for leaks and damage, Alexo saw, on top of a night stand, a small clear plastic bag containing what appeared to be marijuana. Alexo also saw, in an open drawer of the night stand, an open cardboard box

---

[4] As noted, Santillo's two videotaped statements marked as exhibits S–21 and S–22, were played for the trial judge as part of the evidence adduced at the hearing. Although the statements were not transcribed by counsel, they have since been transcribed at our request for purposes of the appeal.

containing what appeared to be powder and crack cocaine. Alexo called Santillo into the bedroom, and showed the landlord what he had seen. Santillo observed the same items. Neither Alexo nor Santillo touched the items.

Santillo and Alexo immediately walked out of the apartment. Santillo then called the police because he was, as he put it, "afraid" that "the guy [presumably referring to defendant] was going to come back[.]"

Within about five minutes, Officer Christie, responding to the police dispatch, arrived at the scene. Officer Christie walked to the front door of the apartment, where he was met by Santillo and Alexo. Santillo explained to Officer Christie that he had come to the apartment at the tenant's request to address a major water leak. Santillo advised the officer that both he and Alexo had seen drugs inside the bedroom.

Santillo led Officer Christie into the apartment, accompanied by Alexo. The officer was shown the leak in the kitchen, observing the large hole in the ceiling from which water was dripping down to the floor and table.

Officer Christie then went to the master bedroom, as he described it, "to confirm what [Santillo and Alexo] saw." The officer saw marijuana on a night stand, as well as an open drawer with a cardboard box inside it containing powder and crack cocaine. He also saw a small scale inside the open drawer. Officer Christie did not have to touch anything in the room in order to observe these items. He did not seize the marijuana, the cocaine, or the scale at that time.

Officer Christie returned to the kitchen while Santillo and Alexo continued to work on the leak. The officer stayed in the kitchen and called the dispatch unit to inform them of what he had observed. Officer Christie then stood in the kitchen at the apartment's front door, watching as Santillo and Alexo worked on the leak, to ensure that no one went into the bedroom.

Officer Johnny Washington arrived at the apartment roughly five to fifteen minutes after Officer Christie arrived, but before

Officer Christie called dispatch. Officer Washington stayed outside to ensure that no one else entered the apartment.

About ten to twenty minutes after Officer Christie called dispatch, Officer Pettway arrived, along with Officer Raisin and two other Asbury Park officers. Officer Pettway then spoke with Santillo and Alexo. Santillo explained the situation to Officer Pettway in essentially the same manner as he had to Officer Christie.

Officer Pettway obtained James's phone number from Santillo and called her. He advised her that the landlord had found "items" in her apartment, and that she should return to the apartment so those items could be retrieved. While Pettway made this phone call, he and the other officers were outside the apartment. Santillo and Alexo, meanwhile, continued to work on the leaking pipe.

James arrived at the apartment by taxi about fifteen or twenty minutes later. Officer Pettway told James that narcotics had been found in her apartment, and that he needed to enter her apartment to remove them and check for other narcotics. According to Officer Pettway, James appeared nervous, but she was not shaking.

Officer Pettway informed James of her *Miranda* [5] rights and that she had the right to refuse to allow the search of her apartment. James acknowledged that she understood her *Miranda* rights and signed a card to that effect. Officer Pettway also showed a consent-to-search form to James and explained its contents to her. She signed the form, confirming that she understood her right to refuse to allow a search and that she consented to the search. James did not, however, waive her right to be present while the search was conducted.

According to Officer Pettway, at no time did any officer tell James that if she refused to consent to a search that the Division

---

[5] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

of Youth and Family Services ("DYFS") would be called to remove James's children from her custody.[6] He further testified that none of the officers who were present coerced James into filling out the consent-to-search form. Officer Pettway was confident that James understood all of her rights because "as [he] was reading the form, she was kind of following along with [him]. She acknowledged she understood ... the entire form and [her] rights."

James then telephoned defendant and asked him to come to the apartment. Officer Pettway was told by Santillo that defendant lived at the apartment with James. When James advised Officer Pettway that she was unsure if defendant would come back, Officer Pettway asked her to call defendant again so that he could speak with him. She obliged, and Officer Pettway asked defendant to return to the apartment because narcotics had been found there. According to Officer Pettway, defendant stated that he would come to the apartment, but claimed that he did not "really live there[.]"

At that point, James led Officer Pettway and other officers into her apartment. She showed them the leak in her kitchen, and then her bedroom which she shared with defendant. In the bedroom, Officer Pettway observed in open view a bag of marijuana and baking soda on top of the night stand. He also saw several bags of cocaine inside an open drawer in the night stand. He observed these items as soon as he entered the bedroom. He did not have to touch anything to see the marijuana and cocaine.

Officer Pettway also saw a digital scale in the night stand drawer with powder residue on it, which he observed when he stood over the night stand. The drawer was about halfway open, but Officer Pettway opened it more so that he could take a better picture of its contents before seizing them.

---

6 According to Officer Pettway, Asbury Park police officers are "encouraged to call DYFS" when drugs are found in a home where children live. DYFS is now known as the Division of Child Protection and Permanency. *L.* 2012, *c.* 16, eff. June 29, 2012.

Next, Officer Pettway found a partially opened black and red backpack standing up against the night stand, which looked to him like it had the butt of a handgun inside. Officer Pettway opened the bag and found a handgun inside. A magazine was loaded inside the gun, and a hollow point round was in the chamber.

Officer Pettway also found a camera bag in the closet in the bedroom which contained roughly one hundred bullets of various calibers, including hollow point bullets. According to Officer Pettway, James was with the officers during the entire search. At no time did she deny ownership of the items the officers found, although she appeared "surprised" when the officers found the camera bag.

In addition to these items, Officer Pettway found sandwich bags and baking soda in the apartment, items which he testified were commonly used in the preparation and packaging of drugs. Furthermore, he found a telephone bill addressed to defendant at the apartment's address. The officers located in the kitchen a Pyrex plate and measuring cup with powder residue on them, which Officer Pettway believed to be cocaine. Officer Pettway suspected that the plate and measuring cup had been used to cook cocaine. According to Officer Pettway, James never objected to anything the police officers did as they performed the search of her apartment.

Officers then placed James under arrest, and helped her lock up her apartment. Defendant finally arrived as the officers were preparing to leave. The officers advised defendant of what had been found inside the apartment, and Officer Pettway likewise placed him under arrest.

In her own testimony at the suppression hearing,[7] James disputed several of the contentions of Santillo and the testifying officers. Most notably, she contended that she had not given permission to

_____

[7] Despite being a co-defendant in the same indictment, James did not join in defendant's motion to suppress the evidence seized by the police. As James took

Santillo to enter the premises in her absence, claiming that she had made an appointment with Santillo to meet him at the apartment at 4:00 p.m. on Monday. She also claimed that she had signed the consent-to-search form and cooperated with the police only because she was scared that the police would call DYFS. She disclaimed any prior knowledge that drugs, drug paraphernalia, or a gun were in the apartment.

On cross-examination of James, the prosecutor showed her segments of a videotaped statement that she had given to the police following her arrest. During the course of that statement, James had acknowledged that defendant does not "allow" her to speak to certain men without his approval. She denied to the court, however, that defendant had forced her to testify at the suppression hearing, asserting that she had testified because of her receipt of the defense subpoena.

### B.

Upon considering these proofs, Judge Reisner denied the motion to suppress in a detailed, twenty-two-page written opinion issued on January 10, 2011. In that opinion, the judge explained at length why the warrantless police search of James's apartment and the seizure of the drugs, gun, and other contraband were constitutionally valid. The judge also made important credibility findings that supported the State's position.

More specifically, Judge Reisner ruled that Officer Christie's initial entrance into the apartment and his visual inspection of the night stand fell within the third-party intervention exception to the Fourth Amendment's warrant requirement, a doctrine which has been previously recognized by the courts of this State. *See, e.g., State v. Saez,* 268 *N.J.Super.* 250, 270–79, 633 *A.*2d 551 (App.Div.1993) (D'Annunzio, J.A.D., dissenting), *rev'd and adopt-*

---

the stand, Judge Reisner appropriately informed her on the record that she was not compelled to testify and had an "absolute right to remain silent," but that if she did testify, her statements could be used against her at her own trial. James indicated that she understood that right, and proceeded to testify.

*ing the dissent,* 139 *N.J.* 279, 280, 653 *A.*2d 1130 (1995). The judge found that because Officer Christie's inspection did not expand the scope of the landlord's private observations of the property, the police search did not fall within the ambit of the Fourth Amendment's warrant requirement.

Judge Reisner further ruled that James's consent to search her apartment was valid. The judge specifically found that Officer Pettway's testimony that he had informed James of her rights concerning the search was credible. The judge also found that James's consent was not coerced because she had not been threatened, was not under arrest when she gave consent, had not refused to provide consent at any time, did not assert her innocence, knew her right to refuse to give consent, had received *Miranda* warnings, and did not assist Officer Pettway other than merely being present during the search of the apartment.[8] In addition, the judge found that James's consent to the search included the black backpack and the camera bag, because defendant was not present and objecting to the search, and because James had lawful authority over the premises being searched.

Assessing the credibility issues before him, Judge Reisner notably found that "the testimony of James[ ] is unreliable, untrustworthy, incredible and in all likelihood false in her attempt to exculpate her co-defendant who fathered their child and who controls her in a domineering, abusive relationship." In that same vein, the judge also observed that James's testimony was "coerced and not truthful."

The judge noted that James appeared "visibly shaken and nervous" during her testimony, and that she provided "incongruous" answers to questions.[9] In this regard, he observed that

---

[8] The judge did not make an explicit finding as to whether the police officers threatened to call DYFS.

[9] The judge's written opinion literally states that "defendant was visibly shaken and nervous" but the reference to defendant rather than James is clearly a typographical error.

"[d]uring the course of James'[s] testimony, it became apparent through her mannerisms and general demeanor, as well as her videotaped statements ... that the defendant had and continued to exercise a great deal of control over her actions." The judge also found significant that defendant "prohibited [James] from even speaking to any other males."

By contrast, the judge accepted the factual accounts presented by Santillo and the testifying police officers. The judge noted in his comments during oral argument on the suppression motion that "it's clear *from the landlord's demeanor* [that] he was there to fix the leak. He saw this, and he immediately called the police." (Emphasis added). The judge added that "[t]here's nothing ... untoward [that] has ever been shown that the landlord may have done."

## C.

Following the denial of his motion to suppress, defendant entered into a plea of guilty to all counts of the indictment, preserving his right to appeal the suppression ruling. *See R.* 3:5–7(d). The charges against co-defendant James were ultimately dismissed.

At sentencing, the court merged counts one and three into count two and also merged count five into count four. Applying the pertinent sentencing factors,[10] the court sentenced defendant to a term of five years of incarceration with a minimum of three years of parole ineligibility for each of counts two and four, to run consecutive to one another. *See N.J.S.A.* 2C:44–1. The court likewise sentenced defendant to five years of incarceration on count eight, also to run consecutive to counts two and four. Lastly, the court imposed one year of incarceration for count six, five years of incarceration for count seven, and thirty days of incarceration for the disorderly persons offenses, all to run concur-

---

[10] Defendant does not argue on appeal that his sentence was illegal or excessive.

rent with the consecutive periods of incarceration. In total, the court sentenced defendant to an aggregate custodial term of fifteen years.

## D.

On appeal, defendant solely contests the denial of his motion to suppress. He argues that the warrantless police search of the apartment was unconstitutional and is not justified by the third-party intervention doctrine or any other recognized warrant exception under the Fourth Amendment or the New Jersey Constitution. He specifically raises the following points:

POINT I

BECAUSE THE POLICE EXCEEDED THE SCOPE OF THE SEARCH CONDUCTED BY THE LANDLORD, WHO HAD NO RIGHT TO ENTER HIS TENANT'S BEDROOM OR AUTHORITY TO CONSENT TO THE POLICE DOING SO, ALL EVIDENCE SEIZED AS A RESULT OF THE WARRANTLESS SEARCH SHOULD HAVE BEEN SUPPRESSED. *U.S. CONST.,* AMEND. IV; *N.J. CONST.* ART. I, PARA. 7

A. Neither the Landlord nor his Agent had a Right to Enter the Bedroom

B. The Plain View Doctrine Cannot Justify the Officer's Warrantless Search of the Bedroom: The Landlord Had No Right to Consent to the Officer's Entry and the Officer's Observation of the Items Was Not Inadvertent

C. The Officer's Warrantless Search Did Not Fall Within the Third–Party Intervention Exception

POINT II

THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED IN THE WARRANTLESS SEARCH OF THE DEFENDANT'S APARTMENT BECAUSE THE DEFENDANT'S CONSENT WAS NOT VOLUNTARY, AND AS A RESULT THE SEARCH WAS CONDUCTED IN VIOLATION OF THE FEDERAL AND NEW JERSEY CONSTITUTIONS

We now consider these arguments.

## II.

Under the Fourth Amendment of the Federal Constitution and under Article 1, paragraph 7 of the New Jersey Constitution, "[a] warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." *State v. Cooke,* 163 *N.J.* 657, 664, 751 *A.*2d 92 (2000); *see*

*also State v. Alston,* 88 *N.J.* 211, 230, 440 *A.*2d 1311 (1981). Evidence seized by the government in the absence of warrant, or a recognized constitutional exception, must be excluded at the defendant's criminal trial. *Mapp v. Ohio,* 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.*2d 1081 (1961) (declaring that the exclusionary rule implementing the Fourth Amendment applies to states through the Fourteenth Amendment); *State v. Hempele,* 120 *N.J.* 182, 223, 576 *A.*2d 793 (1990) (similarly applying the exclusionary rule where evidence has been seized in violation of the New Jersey Constitution).

Here, the State relies upon the third-party intervention doctrine, a constitutional exception recognized by our Supreme Court in *Saez, supra,* as the essential basis for excusing the lack of a search warrant in this case. To a lesser degree, the parties' briefs also address the "plain view" and "consent-to-search" exceptions.[11] We therefore focus our analysis predominantly upon the third-party intervention doctrine.

A.

Long ago in *Burdeau v. McDowell,* 256 *U.S.* 465, 41 *S.Ct.* 574, 65 *L.Ed.* 1048 (1921), the United States Supreme Court held that the Fourth Amendment warrant requirement applies only to governmental searches and not to searches by private actors. In *Burdeau,* the Court ruled that the Fourth Amendment had not been violated when private detectives seized incriminating items from the defendant's office and turned those items over to government officials. *Id.* at 476, 41 *S.Ct.* at 576, 65 *L.Ed.* at 1051. In reaching that decision, the Court observed that the Fourth Amendment's "origin and history clearly show that it was intended

---

[11] Notably, the State does not argue that the search and seizure here was justified because of exigent circumstances, *see Payton v. New York,* 445 *U.S.* 573, 100 *S.Ct.* 1371, 63 *L.Ed.*2d 639 (1980). Nor does it invoke the "community caretaking" doctrine, insofar as that particular exception can allow warrantless entries into dwellings in emergency situations. *See State v. Vargas,* 213 *N.J.* 301, 63 *A.*3d 175 (2013).

as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies[.]" *Id.* at 475, 41 *S.Ct.* at 576, 65 *L.Ed.* at 1051. Although the Court recognized that the private seizure of the defendant's property was wrongful, it found it significant that no government official had "anything to do" with that seizure. *Ibid.* The Court further noted that the defendant "ha[d] an unquestionable right of redress against those who illegally and wrongfully took his private property ... but with such remedies [the Court was not] concerned." *Ibid.*

These principles have been reaffirmed by the Court in subsequent opinions. For example, in *Walter v. United States,* 447 *U.S.* 649, 100 *S.Ct.* 2395, 65 *L.Ed.*2d 410 (1980), the Court found no Fourth Amendment violation by the FBI's mere receipt of sealed packages of films that had been misdelivered to a private party who then turned over the films to FBI agents. The Court noted that there would be "nothing wrongful" in the government's "examination of [the package's] contents *to the extent that they had already been examined* by third parties." *Id.* at 656, 100 *S.Ct.* at 2401, 65 *L.Ed.*2d at 417 (emphasis added). However, the Court majority in *Walter* held that the further steps taken by the FBI agents to screen the films, which went beyond the scope of the private party's examination, triggered the constitutional need for a warrant because the private search had been expanded. *Id.* at 658–59, 100 *S.Ct.* at 2402–03, 65 *L.Ed.*2d at 418–19.

In *United States v. Jacobsen,* 466 *U.S.* 109, 104 *S.Ct.* 1652, 80 *L.Ed.*2d 85 (1984), the Court again applied these private search concepts in upholding a Drug Enforcement Agency ("DEA") agent's inspection and field testing of white substances contained within a package that had been turned over to the DEA by a private delivery company. Employees of the delivery company had opened the package, which had been damaged by a forklift, to examine its contents pursuant to the company's policy concerning insurance claims. *Id.* at 111, 104 *S.Ct.* at 1655, 80 *L.Ed.*2d at 92. The package had five or six pieces of crumbled newspaper cover-

ing a tube made of duct tape. *Id.* at 111, 104 *S.Ct.* at 1655, 80 *L.Ed.*2d at 93. The employees cut open the tube, and found inside several zip-lock plastic bags containing white powder. *Ibid.* The employees notified the DEA, and before the DEA agents arrived, put the plastic bags back into the tube, and placed the tube and newspapers back into the box. *Ibid.* A DEA agent reopened the package and removed the plastic bags. *Ibid.* He then opened each of the bags, removed traces of the white powder, and performed a field test confirming that the powder was cocaine. *Id.* at 111–12, 104 *S.Ct.* at 1655, 80 *L.Ed.*2d at 93.

Analyzing these circumstances in *Jacobsen,* the Supreme Court first noted that the parcel employees' acts in opening the package did not implicate the Fourth Amendment "because of their private character." *Id.* at 115, 104 *S.Ct.* at 1657, 80 *L.Ed.*2d at 95. The Court further reasoned that the DEA agent's removal of the bags from the tube and his visual inspection of their contents was not unconstitutional because these actions "enabled the agent to learn nothing that had not previously been learned during the private search." *Id.* at 120, 104 *S.Ct.* at 1660, 80 *L.Ed.*2d at 98. The Court also upheld the agent's field testing of the powder, concluding that the chemical analysis did not "compromise any legitimate interest in [the defendant's] privacy." *Id.* at 123, 104 *S.Ct.* at 1661, 80 *L.Ed.*2d at 100. Hence, the warrantless search in *Jacobsen* "did not infringe any constitutionally protected privacy interest that had not already been frustrated as the result of private conduct." *Id.* at 126, 104 *S.Ct.* at 1663, 80 *L.Ed.*2d at 102.

The rationale of these Supreme Court precedents involving privately initiated searches is generally consistent with the modern rationale of the exclusionary rule. The exclusionary rule is founded upon a primary objective to deter unconstitutional searches by federal and state law enforcement officials. *Mapp, supra,* 367 *U.S.* at 656, 81 *S.Ct.* at 1692, 6 *L.Ed.*2d at 1090; *see also Herring v. United States,* 555 *U.S.* 135, 144, 129 *S.Ct.* 695, 702, 172 *L.Ed.*2d 496, 507 (2009). As a leading Fourth Amendment scholar has observed, "the exclusionary rule would not likely

deter the private searcher, who is often motivated by reasons independent of a desire to secure [a] criminal conviction and who seldom engages in searches upon a sufficiently regular basis to be affected by the exclusionary sanction." Wayne R. LaFave, *Search and Seizure* § 1.8(a) at 361 (5th ed. 2012). Professor LaFave also points out that admitting the fruits of a private search that has been conducted without the government's involvement does not allow the government to benefit from its own wrongdoing. *Ibid.* For these and other reasons, "[v]irtually all courts continue to follow the *Burdeau* rule." *Ibid.*

In New Jersey, the third-party intervention doctrine was endorsed by this court and the Supreme Court in *Saez, supra*, 268 *N.J.Super.* 250, 633 *A.*2d 551. In *Saez*, a neighbor had seen one of the defendants engage in "narcotic activity" through gaps in a wooden barrier that separated their basements. *Id.* at 256–57, 633 *A.*2d 551. The neighbor informed the police of what she saw, and an officer went to the neighbor's basement to confirm the allegation. *Ibid.* The officer saw three men making crack cocaine through gaps in the wooden wall, and used a mirror to observe the men through a gap in the wall above a furnace. *Id.* at 257–58, 633 *A.*2d 551.

The officer in *Saez* also saw another person enter the opposing basement and take part in the production of the drugs. *Id.* at 258, 633 *A.*2d 551. Police officers arrested two of these persons as they transported the drugs away from the home but the others were not apprehended, enabling the officers to continue observing the drug-making activities through the wooden wall in the basement. *Id.* at 258–59, 633 *A.*2d 551. The continued observations proved fruitless, but the neighbor claimed to have seen additional activity roughly a week later, and a warrant was issued based upon that information. *Id.* at 259, 633 *A.*2d 551.

The defendants in *Saez* argued that the police officer's observations through the wall constituted a violation of their Fourth Amendment rights. *Id.* at 259–60, 633 *A.*2d 551. In his dissenting opinion adopting that argument, Judge D'Annunzio recognized

the principle that "where the government *expands the private search*, the third-party intervention exception no longer applies to the fruits of the expanded search." *Id.* at 271, 633 *A.*2d 551 (D'Annunzio, J.A.D., dissenting) (emphasis added). Moreover, the judge found that there was an important difference between a neighbor's peering through the wall to watch the defendants, and the police watching the defendants through the wall to obtain incriminating evidence. *Id.* at 278, 633 *A.*2d 551 (D'Annunzio, J.A.D., dissenting). Ultimately, Judge D'Annunzio concluded that the police surveillance of the defendants was in violation of the Fourth Amendment.[12] *Id.* at 279, 633 *A.*2d 551 (D'Annunzio, J.A.D., dissenting). *But cf. State v. Frank,* 112 *N.J.Super.* 592, 272 *A.*2d 309 (App.Div.1971) (finding no Fourth Amendment violation when a babysitter opened a package delivered to the defendant parents' home, "apparently out of curiosity," found marijuana in the package, and allowed the police to seize the package, because the babysitter's conduct was not deemed "governmental action").

The Supreme Court adopted Judge D'Annunzio's dissenting opinion in *Saez,* in a brief per curiam opinion. *Saez, supra,* 139 *N.J.* 279, 653 *A.*2d 1130. That opinion, in its entirety, is as follows:

> Defendants appeal as of right on the basis of the dissent in the Appellate Division. *R.* 2:2–1(a). We reverse the judgment of the Appellate Division substantially for the reasons set forth in Judge D'Annunzio's dissenting opinion. 268 *N.J.Super.* 250, 270–79 [633 *A.*2d 551] (1993). Although we do not imply that the third-party intervention exception applies only when the informant previously has reduced to possession the objects viewed by law-enforcement officials, we are generally in accord with the dissenting opinion's analysis that described the extended and continuous police surveillance as a significant expansion of the

---

[12] The majority concluded, to the contrary, that the police's conduct was not violative of the defendants' Fourth Amendment right because the "observations went no further than that of the informant's in frustrating or infringing upon [the] defendants' privacy." *Id.* at 264, 633 *A.*2d 551. Notably, both the *Saez* majority and dissent recognized the general viability of the third-party intervention doctrine, but only differed in the application of the doctrine to the facts in that case. *Id.* at 259–64, 270–79, 633 *A.*2d 551.

informant's prior observation of the activities conducted in the adjacent basement. *Id.* at 272–73 [633 *A*.2d 551].

Because the majority and the dissenting member of the Appellate Division panel agreed that defendants retained a reasonable expectation of privacy in respect of their activities in the basement apartment, and that under the circumstances the extended surveillance of the activities conducted in the adjacent basement was not a reasonable search otherwise justified by the plain-view exception to the requirement for a search warrant, that issue is not before us and we do not address it.

Judgment reversed. The matter is remanded to the Law Division for retrial.

Other New Jersey Supreme Court cases have indicated in passing that the third-party intervention exception is a valid exception to the warrant requirement, but *Saez* represents the Court's only analytical discussion of the doctrine. *E.g., State v. Moore,* 181 *N.J.* 40, 45, 853 *A*.2d 903 (2004); *State v. Hill,* 115 *N.J.* 169, 173, 557 *A*.2d 322 (1989); *State v. Mollica,* 114 *N.J.* 329, 355, 554 *A*.2d 1315 (1989). *But see Hempele, supra,* 120 *N.J.* at 207, 576 *A*.2d 793 (noting, in a curbside trash search case that did not involve the State's invocation of the third-party intervention doctrine, that "[p]eople who have legal access to a constitutionally-protected area often do not have authority to consent to a police search").

Both Judge D'Annunzio in *Saez,* 268 *N.J.Super.* at 271, 633 *A*.2d 551, and the trial judge in the present case, cited to the Fifth Circuit's opinion in *United States v. Bomengo,* 580 *F*.2d 173 (5th Cir.1978), *cert. denied,* 439 *U.S.* 1117, 99 *S.Ct.* 1022, 59 *L.Ed.*2d 75 (1979), as authority for applying the third-party intervention doctrine to a landlord-tenant context. The facts in *Bomengo* are strikingly similar in many respects to the case at bar. There, the chief engineer at an apartment complex noticed water leakage outside an apartment and wanted to fix it. *Id.* at 174–75. The engineer could not locate the apartment occupants, so he forced open the door and entered the apartment. *Id.* at 175. He called the security director of the apartment complex, and the two men inspected the apartment to determine the severity of the leak and to ensure that no ill or disabled persons were inside. *Ibid.* In the course of the inspection, they found two handguns with attached silencers and called the police. *Ibid.* When an officer arrived, the chief engineer and security director led the officer to where the

guns were sitting. *Ibid.* Without anyone touching the guns, the officer observed the two silencers, and left the apartment to obtain a search warrant. *Ibid.*

The Fifth Circuit noted in *Bomengo* that the case "turns on the fact that the efforts of the apartment employees to deal with the leaking water were not illegal and were a reasonably foreseeable intrusion of privacy." *Id.* at 176. The chief engineer and security director inadvertently found the silencers in open sight while in the process of pursuing the legitimate goals of determining the severity of the water damage and ensuring that there were no ill or disabled persons in the apartment. *Ibid.* Because the police officer's subsequent viewing of the silencers inside the apartment was "confined strictly to the scope of the initial discovery," his conduct was not declared a violation of the resident's Fourth Amendment rights, despite the absence of a warrant. *Ibid.*

Other federal and state courts have similarly applied the third-party intervention doctrine to a landlord's entry into a unit and subsequent action in calling the police after discovering potential evidence of a crime inside. *See, e.g., United States v. Moffett,* 885 *F.Supp.* 237 (N.D.Ala.1995) (finding no Fourth Amendment violation where a landlord entered an unlocked commercial property into which a tenant had partially moved, found inside a briefcase containing counterfeit money, and turned the briefcase over to local police), *aff'd,* 89 *F.*3d 855 (11th Cir.1996); *State v. Krajeski,* 104 *Wash.App.* 377, 16 *P.*3d 69 (2001) (finding no Fourth Amendment violation where the defendant's mother and landlords entered his apartment to retrieve his dog and thereafter reported to the police that they had seen a stolen bicycle within the apartment).

That said, we are mindful that the United States Supreme Court has also recognized that a landlord generally does not have the authority to provide the police with valid consent to search a tenant's leased unit. *See Chapman v. United States,* 365 *U.S.* 610, 81 *S.Ct.* 776, 5 *L.Ed.*2d 828 (1961); *see also United States v. Matlock,* 415 *U.S.* 164, 94 *S.Ct.* 988, 39 *L.Ed.*2d 242 (1974). The

tenant enjoys the exclusive right to privacy within his or her leasehold during the tenancy, subject to a landlord's qualified right to enter the unit for repairs, inspections, or other similar purposes upon proper notice. *See Campi v. Seven Haven Realty Co.*, 294 *N.J.Super.* 37, 42, 682 *A.*2d 281 (Law Div.1996) (noting that a tenant generally obtains "full, complete, and exclusive possession" to the leased premises); *Adrian v. Rabinowitz*, 116 *N.J.L.* 586, 186 *A.* 29 (Sup.Ct.1936). In that regard, *N.J.A.C.* 5:10–5.1(c) requires tenants to give landlords or their agents "access to any part of the unit of dwelling space upon reasonable notification, which under ordinary circumstances shall be one day for multiple dwellings[.]" As an exception to that guideline of one-day notice, the regulation adds that "[i]n case of safety or structural emergencies *immediate access* [to the landlord] shall be given." *Ibid.* (emphasis added).

■ Because a landlord ordinarily cannot consent to a police search of a tenant's unit, the third-party intervention doctrine becomes important in search-and-seizure jurisprudence as an alternative theory for dispensing with the warrant requirement. This is illustrated by *Bomengo, supra,* where the lack of a warrant was excused—not because the landlord consented to the police entry—but instead because the third-party intervention doctrine allowed the police to examine what the landlord had already viewed in the course of his private observations of the leased premises. 580 *F.*2d at 176. It is critical, therefore, that the police's entry in those circumstances be no greater than the scope of the landlord's private observations. It is also essential that the landlord's entry not be orchestrated by the police in a manner in which the landlord was acting, in essence, as an agent of law enforcement.

Despite the rather broad language explaining the third-party intervention doctrine in cases such as *Jacobsen* and *Bomengo,* courts in some jurisdictions have questioned whether the doctrine should pertain to warrantless police searches of residential property. *See, e.g., United States v. Williams,* 354 *F.*3d 497 (6th

Cir.2003) (noting a distinct privacy expectation within the home that rendered the police search unconstitutional); *United States v. Allen,* 106 *F.*3d 695, 699 (6th Cir.) (finding that the third-party intervention exception did not apply to residences, reasoning that "[the defendant] had a legitimate and significant privacy interest in the contents of his motel room and this privacy interest was not breached in its entirety merely because the motel manager viewed some of those contents"), *cert. denied,* 520 *U.S.* 1281, 117 *S.Ct.* 2467, 138 *L.Ed.*2d 223 (1997); *People v. Brewer,* 690 *P.*2d 860 (Colo.1984) (finding that because a landlord lacked the authority to permit police officers to enter her tenant's residence to seize marijuana that she had located therein, the seizure by the police officers was unconstitutional); *State v. Miggler,* 419 *N.W.*2d 81 (Minn.App.1988) (distinguishing the case from *Jacobsen* on the basis that police entered a residence to conduct a search, and exceeded the scope of the search that a private party had previously conducted); *State v. Barkmeyer,* 949 *A.*2d 984, 996 (R.I. 2008) (noting in dicta that a police search of a home subsequent to a private search that uncovered evidence suggesting child abuse "require[d] analysis beyond the law of private search"); *State v. Eisfeldt,* 163 *Wash.*2d 628, 185 *P.*3d 580 (2008) (holding that a police search of a private residence, though not larger than the scope of a previous private search, was nevertheless unconstitutional).

Alternatively, without rejecting wholesale the application of the doctrine in a residential setting, decisions of the Fifth and Eighth Circuits have restricted the third-party intervention doctrine to situations where the private party's intrusion into the residence was reasonably foreseeable. For instance, in *United States v. Paige,* 136 *F.*3d 1012 (5th Cir.1998), the Fifth Circuit considered a situation involving a defendant who had hired contractors to do roofing work at his home. The roofers accidentally damaged a portion of the house's siding. *Id.* at 1015. The defendant had previously pointed the roofers to his garage "if [they] needed anything." *Ibid.* When the roofers entered the garage to search for replacement materials for the damaged siding, they observed

what appeared to be several packages of drugs stored within the garage joists. *Ibid.* They informed the authorities of this discovery, and police subsequently conducted a visual inspection to confirm the roofers' observations. *Id.* at 1015–16. Police arrested the defendant, and the District Court convicted him of possession of marijuana with intent to distribute. *Id.* at 1016, 1024. The defendant appealed on the basis that the drugs should have been suppressed at trial. *Ibid.*

The Fifth Circuit in *Paige* affirmed the District Court, reasoning that the private party's search was reasonably foreseeable. *Id.* at 1020–21. The Circuit Court likened the situation to that of residential windows which have been left undraped, or apartment doors that have been left ajar. *Id.* at 1019. The court explained that "activities or circumstances within a dwelling [itself]" may also lessen an occupant's privacy expectation, provided that such activities or circumstances create a "risk of intrusion [that] is reasonably foreseeable." *Ibid.* (internal citation and quotation marks omitted). Such circumstances, the court elaborated, were those that would diminish a home occupant's expectation of privacy, at least in those portions of the home. *Ibid.* Applying these concepts to the record in *Paige*, the court held that the roofers' entrance into the garage was reasonably foreseeable to the defendant, particularly in light of the fact that he had pointed them toward it to search for repair materials. *Id.* at 1021. The court thus upheld the defendant's conviction, holding that the subsequent police search of defendant's residential property did not violate the Fourth Amendment because of the third-party intervention exception. *Id.* at 1024.

The Eighth Circuit Court of Appeals followed a similar approach in *United States v. Miller*, 152 *F.*3d 813 (8th Cir.1998). The defendant in that case was a resident at a halfway house for adults with severe, persistent mental illnesses. *Id.* at 814. The halfway house had a policy that required residents to periodically receive their medications at a central location. *Ibid.* If a resident failed to appear, staff members of the halfway house typically

would go to the resident's apartment. *Ibid.* Additionally, because the halfway house catered to persons with mental illnesses or who otherwise posed a danger to themselves or to others, staff members had a master key, with which they could access the apartments within the site. *Id.* at 814–15.

A staff member went to the defendant's apartment in *Miller* to check on him. *Id.* at 815. The defendant was away for the weekend, but the staff member had forgotten that fact. *Ibid.* At the door of his unit, she smelled cigarette smoke emanating from behind the door. *Ibid.* Because smoking was not permitted within the site, the staff member opened the door to investigate. *Ibid.* Inside, she saw cigarette butts, ashes, and evidence of drug use in plain view. *Ibid.* Staff members alerted the police, admitted them into the defendant's apartment, and permitted the police to confirm visually the private-party's earlier discovery. *Ibid.* At trial, the District Court granted the defendant's motion to suppress drugs seized from his apartment, on the theory that the police's entry into the defendant's home predicated on the staff member's consent was unlawful. *Ibid.* The consenting party, the District Court explained, must have actual or apparent authority to give consent, but the staff member did not. *Ibid.*

The Eighth Circuit disagreed, stating in *Miller* that the facts in that case offered an "application of *Jacobsen*'s private search rule . . . as straightforward as the rule itself." *Id.* at 816. The court explained that when the staff member entered the defendant's apartment in a private capacity, she did so without any impetus from police. *Ibid.* It was only after her discovery and the subsequent call to authorities that police became involved. *Ibid.* The court thus concluded that the police entry there was proper because the private party's entry into the apartment was reasonably foreseeable. *Ibid.*

We agree that, at a minimum, a similar limitation should apply to the application of the third-party intervention doctrine to warrantless residential searches in this State. Such a limitation would be in keeping with the robust protection that our courts

afford to the privacy of private dwellings. *See, e.g., Vargas, supra,* 213 *N.J.* at 313, 63 *A.*3d 175; *State v. Evers,* 175 *N.J.* 355, 384, 815 *A.*2d 432 (2003) (noting that "[t]he privacy interests of the home are entitled to the highest degree of respect and protection in the framework of our constitutional system"). "Indeed, 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Vargas, supra,* 213 *N.J.* at 313, 63 *A.*3d 175 (quoting *United States v. U.S. Dist. Court,* 407 *U.S.* 297, 313, 92 *S.Ct.* 2125, 2134, 32 *L.Ed.*2d 752, 764 (1972)).

Recently in *Florida v. Jardines,* —— *U.S.* ——, 133 *S.Ct.* 1409, 185 *L.Ed.*2d 495 (2013), the United States Supreme Court reinforced the heightened status that the privacy of a private residence is accorded under the Fourth Amendment. The Court majority invalidated the police's use of a drug-sniffing dog brought to the defendant's front porch in order to sense whether there were drugs inside the residence. *Id.* at ——, 133 *S.Ct.* at 1417–18, 185 *L.Ed.*2d at 504. The dog gave a positive alert for narcotics, which then led the police to obtain a search warrant and seize marijuana plants they found inside. *Id.* at ——, 133 *S.Ct.* at 1413, 185 *L.Ed.*2d at 500. In finding this police activity to violate the Fourth Amendment, the Court underscored the historical protection the law has afforded to private residences. *Id.* at ——, 133 *S.Ct.* at 1414, 185 *L.Ed.*2d at 500–01; *see also Kyllo v. United States,* 533 *U.S.* 27, 121 *S.Ct.* 2038, 150 *L.Ed.*2d 94 (2001) (invalidating police surveillance of a home using thermal-imaging equipment).

Justice Scalia's opinion for the Court in *Jardines* distinguished *Jacobsen,* noting that *Jacobsen* involved inspection of "a parcel in transit" rather than an entry into a private residence. *Jardines, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 1417, 185 *L.Ed.*2d at 504. His opinion noted that the police had violated the defendant's property rights by physically intruding upon his premises with a forensic dog in a constitutionally-protected area, namely the curtilage of the house. *Id.* at ——, 133 *S.Ct.* at 1417–18, 185 *L.Ed.*2d at 504. The invasion was "not explicitly or implicitly permitted by

the homeowner." *Id.* at ——, 133 *S.Ct.* at 1414, 185 *L.Ed.*2d at 501. In a concurring opinion in *Jardines* joined by two other members of the Court, Justice Kagan rested her analysis upon the officers' violation of the defendant's privacy expectations in addition to his property rights. *Id.* at ——, 133 *S.Ct.* at 1418, 185 *L.Ed.*2d at 505 (Kagan, J., concurring).

Regardless of whether one follows the property-based reasoning of Justice Scalia or the privacy-expectations approach of Justice Kagan, *Jardines* signifies that an indiscriminate and unqualified application of the third-party intervention doctrine clashes with the enhanced protection that our Fourth Amendment case law accords to private residences from governmental intrusions. The New Jersey Constitution is similarly protective of private residences. *See, e.g., Vargas, supra,* 213 *N.J.* at 312–14, 63 *A.*3d 175.

Given the well-established special importance of the privacy of a home, the police should not be allowed to bootstrap upon a private party's illegal invasion of that domain. It is not enough to say that such an aggrieved resident can sue the private intruder for trespass. That potential civil remedy may be of little value or solace once a criminal prosecution with such tainted origins has proceeded. The criminal consequences to the resident are apt to be far more momentous.

### B.

We therefore join with other jurisdictions in restricting the State's reliance upon the third-party intervention doctrine to justify a warrantless search of a private residence. We do so in a manner that is tied to both the property-based concepts most recently articulated by Justice Scalia in *Jardines* and the privacy expectations underscored in Justice Kagan's concurrence in that case.

Specifically, we hold that, under both our reading of the Fourth Amendment and the New Jersey Constitution, the third-party intervention doctrine will not justify a warrantless search

resulting from a landlord or other third party's entry into a private residence if it is (1) illegal or unauthorized, or (2) in violation of the resident's property rights or reasonable expectation of privacy. If such a wrongful private entry has occurred, it cannot supply the foundation for an ensuing police search of the premises, unless, of course, some other recognized exception to the constitutional warrant requirement applies.[13] As an additional limitation, even if the private entry is not illegal or unauthorized, the third-party intervention doctrine should not apply if the intrusion by the private actor and law enforcement officials, taken as a whole, is objectively unreasonable. Because the third-party intervention doctrine has rarely been invoked by the State in reported case law, we doubt these residency-based restrictions will pose a serious problem for law enforcement.[14]

Applying these limiting principles to the present case, we are satisfied that the trial court properly allowed the State to rely upon the third-party intervention doctrine here. There is a sound basis in the record for concluding that Santillo's entry into James's apartment unit was lawful and did not trample upon her property rights or reasonable privacy expectations. In addition, Santillo's actions in allowing the police to verify his observations, and the officers' entry for that limited purpose, were objectively reasonable. Several factors support these conclusions.

---

[13] Thus, by way of illustration, if a vindictive former roommate unlawfully enters a defendant's home, rummages through the dwelling to turn up proof of wrongdoing, and invites the police into the house to confiscate the evidence the constitutional exception would not pertain.

[14] Our opinion does not alter the analysis in *State v. Navarro*, 310 *N.J.Super.* 104, 708 *A.2d* 416 (App.Div.), *certif. denied,* 156 *N.J.* 382, 718 *A.2d* 1211 (1998), which upheld a warrantless police seizure of a gun in a tenant's apartment discovered by the defendant's landlady. The State relied in that case upon the community caretaking exception, not the third-party intervention doctrine. *Id.* at 108–10, 708 *A.2d* 416. Moreover, the community caretaking analysis in *Navarro* is now subject to the significant limitations recently expressed by the Supreme Court in *Vargas, supra,* 213 *N.J.* at 319–29, 63 *A.3d* 175.

To begin with, the tenant, James, admittedly initiated the process by calling Santillo and asking him to investigate the ongoing ceiling leak. Although the record indicates that her lease was ending the following day and that she and her children were in the process of moving out, James obviously regarded the leak as serious and urgent enough to be addressed before she vacated. The description of the leak provided by Santillo and the testifying police officers corroborates the severity of the problem, which easily could have posed a health or safety hazard.

According to the landlord, he twice received the tenant's agreement to enter the premises, telling her in their Sunday night conversation that he would come and investigate the leak, and again advising her the following morning that he had arrived at the apartment and was intending to go inside. Each time, according to Santillo, the tenant acquiesced. The landlord further endeavored to respect her privacy by waiting approximately thirty minutes before he went inside. The situation reasonably called for no further delay.

Although Santillo did advise the police in his statement that he usually gives a tenant twenty-four hours' notice before going into an apartment to undertake a repair, the circumstances here represent substantial compliance with that general principle, even though not a full twenty-four hours had passed. Defendant did not offer into evidence a copy of the lease, and, notably, he has not argued that any specific provision in the lease was breached. The administrative regulation cited in defendant's brief, *N.J.A.C.* 5:10–5.1(c), only calls generally for one day's notice, which was essentially honored here by the landlord's conversation with the tenant on Sunday followed by his entry on Monday. Moreover, the regulation has an exception for immediate landlord access in emergency situations. *Ibid.* The ongoing leak in James's unit justified the landlord entering when he did, despite her absence.

We are cognizant that James testified, to the contrary, that she had made an appointment with Santillo to meet him there at 4:00 p.m., rather than earlier in the day. There is a more than ample

basis to reject her claim. For one thing, it makes little sense for a tenant to not want a leak in the ceiling, at least one as serious as described in this record, to be addressed until late in the afternoon of the following day. James apparently was unsuccessful in shutting off the main water valve, as Santillo had instructed. A sensible tenant would not want water continually gushing from above into her kitchen. Instead, she would want her landlord to respond to the situation right away.

More importantly, the trial judge did not find James to be a credible witness. As we have noted, the judge found her to be under the domination and influence of defendant, her youngest child's father, and that her testimony had been shaped to help him avoid prosecution. The judge did not express a conclusory opinion about James's credibility, but instead gave detailed reasons for disbelieving her. By contrast, the judge was impressed with Santillo's demeanor on the videotape and the overall reasonableness of the landlord's conduct in responding to the leak.

We must give the judge's well-grounded credibility findings great deference. *State v. Locurto,* 157 *N.J.* 463, 470–71, 724 *A.*2d 234 (1999). The judge had the unique "opportunity to observe and assess the credibility of [James], who testified fully and was subject to extensive cross-examination." *State v. P.S.,* 202 *N.J.* 232, 252, 997 *A.*2d 163 (2010) (quoting the Appellate Division's opinion in that case). We are not to disturb the judge's credibility findings unless "they are so clearly mistaken 'that the interests of justice demand intervention and correction.' " *State v. Elders,* 192 *N.J.* 224, 244, 927 *A.*2d 1250 (2007) (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)).

The record also shows that the landlord acted reasonably in an effort to respect James's property rights and privacy expectations. As noted, he twice gave her notice that he was coming to the property. Although he did not have to do so, he waited for about a half hour outside before he entered the unit. Once inside, he attempted to identify the source and causes of the continuing leak, reasonably walking into the bedroom with the plumber Alexo to

see if the pipes there, which were connected to the kitchen pipes, were involved. Santillo did not rummage through James's belongings. Nor did he snoop around looking for something that might get her in trouble, having little reason to do so since she was in the process of moving out.

By all accounts, including that of James, the clear plastic bag of marijuana was left out on top of the night stand. The cocaine and scale were also visible in the open drawer. The landlord did not need to open any compartments to see the drugs.

James had no reasonable expectation of privacy in such illegal items, which were carelessly left where they could easily be seen after requesting the landlord to come to the apartment. Perhaps she did not realize that the landlord or a plumber might need to trace the kitchen pipes into the bedroom, but Santillo should not be held responsible for such a mistaken assumption, if it existed at all. Or perhaps defendant had stayed overnight and departed from the apartment on Monday morning, after James had already gone, and left the items out in the open, but that likewise does not affect the analysis of James's privacy interests.

For these abundant reasons supported by the record, we are satisfied that the landlord did not act illegally here in entering the apartment, nor did he violate the property rights or the reasonable privacy expectations of his tenant.

■ The next steps taken by the landlord in notifying the police and allowing them to enter the apartment to confirm the presence of the contraband he had just observed were also justified, and in keeping with the third-party intervention doctrine. As the United States Supreme Court instructed in *Jacobsen* and *Walter*, where the doctrine applies, the police may reexamine property that has been opened by a private person, so long as they do not exceed the boundaries of the private actor's own visual inspection. *Jacobsen, supra,* 466 *U.S.* at 115–17, 104 *S.Ct.* at 1657–58, 80 *L.Ed.*2d at 96; *Walter, supra,* 447 *U.S.* at 657, 100 *S.Ct.* at 2402, 65 *L.Ed.*2d at 418. Even if the property opened by the private actor has been repackaged or, in this case, the front

door to the apartment was closed, neither the Fourth Amendment nor our State's Constitution is generally offended by the subsequent reopening of the same property, again, so long as the scope of the original search or observation is not exceeded by the police.

Here, the trial judge found, as matter of fact, that the police did not probe more extensively into the apartment once Santillo showed them the places and objects that he had already seen. The police waited before James arrived to secure her permission to a search. Although the police conceivably had probable cause to obtain a warrant, they were not constitutionally required to pursue one here, because of the third-party intervention exception. Indeed, under that doctrine it would have been constitutional for the landlord to have taken the contraband himself to the police station and for the police to examine the items, so delivered, without a warrant. *See Jacobsen, supra,* 466 *U.S.* at 115–16, 104 *S.Ct.* at 1657–58, 80 *L.Ed.*2d at 95–96.

It is also significant to our analysis that the landlord has his own property-based responsibility for, and an interest in, the leased premises. The narcotics that he discovered in the apartment implicated those responsibilities under both criminal and civil law. If, for example, he knowingly allowed illegal drugs to be possessed within his building, he might have faced criminal or civil liability for failing to do something about it.[15] Inasmuch as three minor children lived in the unit, the landlord potentially could have been held accountable if any of them ingested the drugs that Santillo discovered on the premises. We are not presuming that such civil or criminal liability was necessarily likely, but simply note that it strengthens the landlord's proprietary right, as a building owner or owner's agent, to get the police involved promptly upon discovering such contraband.[16]

---

[15] *See, e.g., N.J.S.A.* 2C:35–10c (declaring it a disorderly persons offense to knowingly possess CDS and fail to "voluntarily deliver the substance to the nearest law enforcement officer").

[16] We do not know whether the landlord had these ownership concerns subjectively in mind when he called the police, but that does not matter.

The upstairs tenant's safety and quiet enjoyment also could have been jeopardized if a drug dealer had been living downstairs, a distinct possibility given the marijuana and apparent cocaine that Santillo had observed. A landlord would have been justifiably concerned about the security of the building if drug activity were taking place inside. The police would presumably be more knowledgeable about such narcotics matters, and the landlord had good reason to have them expeditiously confirm the evidence of criminal activity that he believed he had just discovered.

 Once admitted, the police officers acted reasonably in walking through the apartment to confirm the landlord's visual observations. They did not exceed the scope of his own intrusion.

 The touchstone of search-and-seizure analysis is one of reasonableness, for that is what both the Fourth Amendment and the New Jersey Constitution ultimately require in protecting citizens from "unreasonable" intrusions. *State v. Rockford,* 213 *N.J.* 424, 440–41, 64 *A.*3d 514 (2013). Taking the combined actions of the landlord and the police here as a whole, we conclude no such unreasonable invasion occurred here. *Cf. Saez, supra,* 139 *N.J.* at 281, 653 *A.*2d 1130 (invalidating the police action because it was not "a reasonable search").

We recognize that the constitutional analysis might be different if the landlord did not have his own ownership-based interest in, and responsibility for, the premises, or if the contraband that he discovered did not substantially implicate those interests and responsibilities. We need not reach, for example, whether the third-party intervention doctrine would apply if a babysitter, instead of a landlord, had seen the drugs on the night stand. Nor

---

Whether or not he was thinking about them, the landlord did have a degree of responsibility for what was going on in his building. In addition, the landlord in his own police statement expressed that he was "afraid," an understandable feeling upon learning that illegal drug activity was evidently occurring in his building. We agree with Judge Reisner's assessment that the landlord's actions were benign.

do we need to consider whether the doctrine would have justified the landlord in letting the police into the apartment if he had discovered an incriminating item lacking a nexus to his ownership concerns, such as, say, a document on the kitchen counter revealing that the tenant was embezzling funds at work from her employer. All we need to decide is that, as to the particular circumstances presented here, the intrusion into James's apartment was reasonable and constitutional under the third-party intervention doctrine. Notably, the result we attain here is consistent with *Saez*, where, by contrast, the police exceeded the scope of the private party's own observation by conducting "continuous police surveillance" through the gaps in the wooden basement wall. 139 *N.J.* at 280–81, 653 *A.*2d 1130.

In sum, the third-party intervention doctrine was appropriately invoked by the State to validate the apartment entry and police observations that took place here, notwithstanding the residence-based limitations that we place upon the doctrine in this opinion.

## C.

We need not comment at length about the final aspect of the trial judge's analysis, in which he concluded that the police obtained the valid consent of James before searching the apartment in her presence. A few comments will suffice.

It is well-established that a resident of property may vitiate the warrant requirement by consenting to a search by the police. *State v. Domicz*, 188 *N.J.* 285, 305, 907 *A.*2d 395 (2006). "[C]onsent to a warrantless search ... must be shown to be unequivocal, voluntary, knowing, and intelligent." *State v. Sugar*, 108 *N.J.* 151, 156, 527 *A.*2d 1377 (1987). Consent is a factual question determined by an examination of the totality of the circumstances. *State v. Koedatich*, 112 *N.J.* 225, 264, 548 *A.*2d 939 (1988).

Apart from James's discredited testimony, the relevant evidence here amply supports the State's position that James's consent to

the search was valid. Officer Pettway showed a consent-to-search form to James, and read through its contents with her outside her apartment. Specifically, the consent form contains the following: (1) "I have the right to refuse to allow police to conduct the search;" (2) "I have the right to revoke my consent to search at any time and may stop the search at any time;" and (3) "I have the right to be present while the search is conducted." The consent form likewise contains a provision giving consent to allow police officers to seize items found in the premises. James followed along with Officer Pettway as he read the form aloud, and subsequently signed it to indicate her understanding of her rights and her consent to a police search and seizure. James did not waive her right to be present during the search, and accompanied the officers as they searched her apartment. According to the State's witnesses, James was not handcuffed while Officer Pettway asked for her consent to search the apartment. Although James claims that the officers threatened to report her circumstances to DYFS, the trial judge did not find her on the whole to be a credible witness, and there is no other proof of such a claim.

Given the totality of circumstances, we agree with the State that there is a sound evidentiary basis for Judge Reisner's conclusion that James gave valid consent to a search of the premises. The fruits of that search were not inadmissible under the exclusionary rule.[17]

### III.

For these many reasons, the trial court's denial of defendant's motion to suppress is affirmed, as is his ensuing conviction.

---

[17] Because the police did not seize the contraband or commence their full-blown search of the apartment until after securing the tenant's consent, there is no need for the State to rely upon the "plain view" exception to the warrant requirement to justify the police's confiscation. *See State v. Earls*, 214 *N.J.* 564, 70 *A.*3d 630, 2013 *WL* 3744221 (2013) (delineating the elements of the plain view doctrine in the context of a non-consensual warrantless seizure); *see also State v. Mann*, 203 *N.J.* 328, 340–41, 2 *A.*3d 379 (2010) (applying plain view concepts).